LOUIS C. VACCARO AND JEAN M. VACCARO, PETITIONERS *v.* COMMIS-SIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6377–69.   Filed July 31, 1972.

*Dexter E. Martin*, for the petitioners.
*Lee A. Kamp*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes for the taxable years 1966 and 1967 in the amounts of $214.09 and $249.71, respectively.

The only issue for decision is whether payments of U.S. Department of Health, Education, and Welfare funds by the University of Oregon to petitioner Louis C. Vaccaro in the amounts of $1,200 in 1966 and $1,500 in 1967 are excludable from his gross income as amounts received as a fellowship grant within the meaning of section 117 of the 1954 Code.[1]

FINDINGS OF FACT

The stipulation of facts, together with the exhibits attached thereto, are so found and incorporated herein by this reference.

Louis C. Vaccaro (hereinafter referred to as petitioner or Vaccaro) and Jean M. Vaccaro are husband and wife. They filed their joint individual Federal income tax returns for the calendar years 1966 and 1967 with the district director of internal revenue, Portland, Oreg.

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.

Both petitioner and his wife were residents of Vancouver, Wash., at the time the petition herein was filed.

In 1965 petitioner sought to further prepare himself for a potential career as an administrator in higher education. At that time his educational background included a bachelor of arts degree received from the University of Southern California in 1957, a master of arts degree received from San Fernando Valley State College in 1960, and a doctoral degree received from Michigan State University in 1963. He also had wide experience as a college-level instructor in addition to his extensive education.

On June 10, 1965, petitioner wrote to the Center for the Advanced Study of Educational Administration (hereinafter CASEA) at the University of Oregon to inquire about possible opportunities for postdoctoral study and support. This initial inquiry led to a substantial correspondence in the following months between petitioner and various administrative officials at the University of Oregon. Through these communications, most of which were between petitioner and Roland J. Pellegrin (hereinafter referred to as Pellegrin), Vaccaro learned of the opportunities available at the University of Oregon. As a result, he submitted his application for a postdoctoral fellowship and was selected in April 1966.

Petitioner's fellowship was to begin September 16, 1966, and continue through June 15, 1967. The stipend was $10,500,[2] and petitioner received as additional benefits faculty privileges to all the university facilities and the right to participate in a group life insurance program and a hospitalization and medical care plan. Additionally, petitioner's period of work as a fellow at the university would have been counted toward his gaining tenure had he chosen to accept a job there as a permanent employee. The amount of petitioner's stipend was based upon his prior salary at Marquette University.

Upon petitioner's acceptance of the fellowship he negotiated a year's leave of absence from his position at Marquette University. In September 1966 he arrived at the University of Oregon to begin work and was placed on the payroll as a research associate. As a research associate, both Federal income taxes and FICA taxes were withheld from his monthly check. Petitioner's stipend was funded directly from moneys received by the university through a cost reimbursement contract negotiated between the U.S. Office of Education (Department of Health, Education, and Welfare, hereinafter HEW) and the Board of Higher Education for the State of Oregon. The contract terms provided only for salaries and wages to those who contributed to the

---

[2] After accepting the position, petitioner agreed to remain at the university through August of 1967, thus making it possible for him to receive $12,832 for his 11 months there.

CASEA programs, viz, there were no funds allocated to fellowship grants. Thus, in accordance with HEW regulations, all recipients of contract funds submitted quarterly time-and-effort reports to the university's administrative research accountant so that they could receive their payments. Petitioner filed the required time-and-effort reports on a quarterly basis, as required.[3] The reports indicated petitioner spent 100 percent of his worktime on the CASEA program.

The HEW cost reimbursement contract, which was the primary source of CASEA operational funds, first became effective on March 26, 1964.[4] The contract was the result of an application submitted to the U.S. Commissioner of Education with the idea of establishing a research and development center in the graduate school of the University of Oregon under the provisions of Pub. L. No. 531, 83d Cong., 2d Sess. (July 26, 1954). Pellegrin, director for the Institute of Community Studies and professor at the University of Oregon, initiated the application which was submitted by Harry Alpert, dean of the graduate school. Pertinent parts of the application read as follows:

> All of the post-doctoral fellows, six in number each year, will be persons who either are teaching school administration or related courses in the behavioral sciences at other universities, or are members of State Departments of Education. These persons will take part in the research program and will become the focal points in dissemination centers in other areas of the country when they return to their positions. It is proposed to help these persons develop research activities, institutes, workshops, and clinics in new areas, using staff from the Center. * * *

>    \*      \*      \*      \*      \*      \*      \*

> The Basic Research Division will be headed by an Associate Director, whose duties involve the conduct and supervision of the basic research program. Beginning in the second fiscal year, it is planned that at least four major research projects will be underway at all times. Each such project will be headed by a project director. Research Associates will also serve as members of the professional staff, and Pre-doctoral Fellows will serve research apprenticeships on these projects. Post-doctoral Fellows will also participate in the research. Interviewers, tabulators, and clerical assistants will be assigned to specific projects as needed.

>    \*      \*      \*      \*      \*      \*      \*

> In order to fill all of the positions mentioned, a search for highly qualified personnel will be conducted throughout the country. Pre-doctoral and post-doctoral fellows will also be selected on the basis of nationwide competition. They will be drawn from education and the various behavioral science disciplines.

---

[3] The university accountant testified at trial that all research associates had Federal income and FICA taxes withheld from their paychecks, but only recipients of HEW funds under the CASEA cost reimbursement contracts had to file the time-and-effort reports. These measures are not a part of normal fellowship stipend payment procedures.

[4] The cost reimbursement contract has been amended 14 times since its execution on Mar. 26, 1964. However, none of the amendments or modifications were made to the contract during the period from the inception of the contract through Dec. 31, 1967.

The application further stated that two of the objectives of the CASEA program would be as follows:

(1) To train competent researchers at the pre-doctoral and post-doctoral levels in order to increase and improve research on the social context of educational organization and administration.

(2) To improve and upgrade the quality of educational administrators through training and dissemination programs.

Thus, the U.S. Office of Education did have some knowledge of the fact that the proposed CASEA program intended to appropriate some of its financial provisions to fund postdoctoral fellowship training programs.

The 1966–67 CASEA promotional brochures described the program's training and research appointments:

Graduate assistantships and research fellowships are available in the behavioral sciences and in educational administration. Assistantships involve active participation in the program.

Appointments as visiting research associates are available for researchers, beginning or experienced, who have a project in mind which would contribute to CASEA's program. Appointment periods range from one to three years and are made on the basis of the proposed research.

At the same time, the University of Oregon administrative manual provided for two separate and distinguishable academic ranks:

(7) *Research Associate* This rank may be used for staff appointees engaged in the conduct and direction of independent research activities. Such appointees normally shall hold the doctoral degree or shall hold the highest degree appropriate in the field or fields of study in which the research is being conducted.

(8) *Fellow* This rank may be used in a variety of cases where individuals are associated with the University for limited periods of time for their further training or experience rather than to provide services to the University. The ranks may be used for both pre- and post-doctoral fellowships.

The 1966 CASEA annual report prepared by Pellegrin explained the purpose and goal of the postdoctoral fellowship program:

As far as the use of CASEA in [sic] concerned, the training of graduate assistants can be considered a by-product of our research activities. On the other hand, we have made a substantial and direct contribution to the research training of post-doctoral research associates in the Center. This post-doctoral program was established during the first months of the Center's operations, when the shortage of qualified researchers in disciplines related to educational organization and administration became painfully apparent. During the 1964–65 academic year, we appointed one post-doctoral fellow. The following year, 1965–66, we appointed six such fellows, the same number appointed during the current academic year. While some of these post-doctoral fellows have completed significant research during their period of residence with us, we have viewed these appointments as being primarily for the purpose of providing the fellow with the opportunity to improve his research skills and to fill in other gaps in his training. For example, most post-doctoral fellows undertake the study of content areas in which they have major research interests. The present

availability of research training funds for the support of post-doctoral fellows makes it unnecessary for us to continue this program. * * *

Pellegrin, director of CASEA and the principal figure petitioner dealt with in gaining the fellowship, believed that Vaccaro was under no obligation to do work of any sort for CASEA. Petitioner was of the same opinion, and both individuals viewed the appointment as an opportunity to improve the participant's training background and research techniques. The task of CASEA fellowship appointees, such as petitioner, was to do whatever reading and research they deemed necessary to develop and improve their individual skills.

From the fall of 1966 through the spring of 1967 petitioner completed three sociology courses for credit and audited two noncredit seminars. Additionally, he read in a wide range of fields, including literature, philosophy, and religion, and he did some writing. Three of his works were published in professional magazines. He also edited a book which has been published and he chaired a symposium on "Problems Related to the Development of Theory in Administration." Vaccaro had little or no contact with permanent CASEA staff researchers and contributed nothing to the formal CASEA research projects.

After his year of participation in the CASEA program, petitioner held the position of vice president of academic affairs of the University of Portland, Portland, Oreg., from May 1968 to September 1970. At present he is president of Marycrest College in Davenport, Iowa.

During the years 1966 and 1967 petitioner received $3,208 and $7,292, respectively, from the University of Oregon, less withholding taxes of $228.81 and $604.25 for the respective years. Of the amounts received, petitioner excluded $1,200 in 1966 and $1,500 in 1967 on his tax returns for those years on the belief that the amounts were excludable as a fellowship grant. In his notice of deficiency, respondent disallowed the petitioner's exclusions on the ground that the amounts were not fellowship grant payments under the provis'.ns of section 117. Petitioner has not received fellowship moneys prior to his participation in the CASEA program which would preclude his use of the section 117 exclusion.

### OPINION

Petitioner argues that the University of Oregon selected him for a postdoctoral fellowship with a $10,500 stipend which he accepted and participated in for a 9-month period from September 1966 to June 1967. He contends it was the intent and understanding of both himself and Pellegrin that the appointment was to be in the nature of an academic grant, that he was required to do no work for the university, and that his own personal research activities were neither an integral

part of the CASEA program nor were they supervised by university personnel. Because he was paid to perform his own research and improve his own professional skills, petitioner argues he should therefore be entitled to exclude $2,700 of the stipend from his gross income under section 117.[5]

Respondent, on the other hand, argues that because the University of Oregon extended to petitioner full faculty privileges during his work there, treated him as an employee for purposes of payroll and recordkeeping, and funded his entire stipend from HEW moneys, which were designated for salaries and wages instead of fellowship grants, Vaccaro should therefore be denied the benefits of section 117.

We are asked to reconcile these contradictory facts with section 117 of the Code.

As we see it, the facts of this case present a form-versus-substance type problem that must be resolved. Each party has based his position on substantial basic facts which we agree are quite contradictory

---

[5] Pertinent parts of sec. 117 provide :

(a) GENERAL RULE.—In the case of an individual, gross income does not include—
   (1) any amount received—
       (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or
       (B) as a fellowship grant,
including the value of contributed services and accommodations ;
   (2) any amount received to cover expenses for—
       (A) travel,
       (B) research,
       (C) clerical help, or
       (D) equipment,
which are incident to such a scholarship or to a fellowship grant, but only to the extent that the amount is so expended by the recipient.

(b) LIMITATIONS.—

\* \* \* \* \* \* \*

   (2) INDIVIDUALS WHO ARE NOT CANDIDATES FOR DEGREES.—In the case of an individual who is not a candidate for a degree at an educational institution (as defined in section 151(e)(4)), subsection (a) shall apply only if the condition in subparagraph (A) is satisfied and then only within the limitations provided in subparagraph (B).
       (A) CONDITIONS FOR EXCLUSION.—The grantor of the scholarship or fellowship grant is—
           (i) an organization described in section 501(c)(3) which is exempt from tax under section 501(a),
           (ii) a foreign government,
           (iii) an international organization, or a binational or multinational educational and cultural foundation or commission created or continued pursuant to the Mutual Educational and Cultural Exchange Act of 1961, or
           (iv) the United States, or an instrumentality or agency thereof, or a State, a territory, or a possession of the United States, or any political subdivision thereof, or the District of Columbia.
       (B) EXTENT OF EXCLUSION.—The amount of the scholarship or fellowship grant excluded under subsection (a)(1) in any taxable year shall be limited to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year, except that no exclusion shall be allowed under subsection (a) after the recipient has been entitled to exclude under this section for a period of 36 months (whether or not consecutive) amounts received as a scholarship or fellowship grant while not a candidate for a degree at an educational institution (as defined in section 151(e)(4)).

and which ordinarily would not be found coexisting in a fellowship-type arrangement. Respondent's position, however, is premised on circumstantial facts, while petitioner's argument and facts go more to the substance of the matter. For this reason, we feel petitioner's position is the sounder of the two.

For petitioner to secure the exclusion he seeks under section 117 he must show that the payments he received have the normal characteristics of a fellowship grant. *Elmer L. Reese, Jr.*, 45 T.C. 407 (1966), affirmed per curiam 373 F.2d 742 (C.A. 4, 1967). The term "fellowship grant" is fully and amply defined in the Income Tax Regulations:

Sec. 1.117-3 Definitions.

(c) *Fellowship grant.* A fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research. The term includes the value of contributed services and accommodations (see paragraph (d) of this section) and the amount of tuition, matriculation, and other fees which are furnished or remitted to an individual to aid him in the pursuit of study or research. The term also includes any amount received in the nature of a family allowance as a part of a fellowship grant. However, the term does not include any amount provided by an individual to aid a relative, friend, or other individual in the pursuit of study or research where the grantor is motivated by family or philanthropic considerations.

(d) *Contributed services and accommodations.* The term "contributed services and accommodations" means such services and accommodations as room, board, laundry service, and similar services or accommodations which are received by an individual as a part of a scholarship or fellowship grant.

The term is further clarified by section 1.117-4(c), Income Tax Regs., which provides:

Sec. 1.117-4 Items not considered as scholarships or fellowship grants.

The following payments or allowances shall not be considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117:

\*       \*       .  \*       \*       \*       \*       \*

(c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.* (1) Except as provided in paragraph (a) of § 1.117-2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research \* \* \* are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit

to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant.

In *Bingler* v. *Johnson*, 394 U.S. 741 (1969), the Supreme Court approved the Commissioner's regulations which other courts had previously held to conform to the statutory purpose. See *Ussery* v. *United States*, 296 F. 2d 582 (C.A. 5, 1961); *Woddail* v. *Commissioner*, 321 F. 2d 721 (C.A. 10, 1963), affirming a Memorandum Opinion of this Court; and *Frank Thomas Bachmura*, 32 T.C. 1117 (1959). The *Bingler* opinion said, in effect, that any grant or stipend received as "bargained-for payments" in return for services rendered, whether past, present, or future, should not be excludable from income as scholarship or fellowship funds. This is the crucial factor, then, for if the recipient of the grant provides a service or an essential benefit to the grantor in return for the payments, there can be no section 117 exclusion.

The standard generally used under the Commissioner's regulations to test whether amounts paid are excludable under section 117 has been the primary-purpose test, in which it is determined whether the payments were made primarily for services beneficial to the grantor, or primarily to aid the individual in his personal pursuit of study or research. *Stephen L. Zolnay*, 49 T.C. 389 (1968); *Howard Littman*, 42 T.C. 503 (1964). The test is most useful when a dual purpose gives rise to the academic grant. See, e.g., *Harvey P. Utech*, 55 T.C. 434 (1970); *John E. MacDonald, Jr.*, 52 T.C. 386 (1969). In the instant case, however, the primary-purpose test, though helpful, is not essential for our determination because the evidence reveals only one real purpose behind petitioner's stipend, viz, to provide him with financial support while he developed his professional skills.

We think the facts clearly show that no significant benefits or services were expected from petitioner by the university as a result of his work there. The letters between petitioner and Pellegrin prior to and after his appointment make it clear that both parties believed the position to be a postdoctoral fellowship and not employment. Nowhere in the correspondence is there any mention of obligations or duties to be required of petitioner in exchange for the $10,500 stipend.

Pellegrin's testimony at trial further supports our analysis of the letters between himself and Vaccaro. He testified that petitioner did not participate in any of the CASEA research projects and he was under no obligation to perform any work for the program. In his view, Vaccaro and the five other postdoctoral fellows "already had doctorates in one field or another and the purpose of * * * giving them the fellowship was to allow them to improve their education and skills so that they could do research in educational administration of high

quality." Again, in the 1966 CASEA annual report Pellegrin, as director of the entire CASEA program, explained that—

While some of these post-doctoral fellows have completed significant research during their period of residence with us, we have viewed these appointments as being primarily for the purpose of providing the fellow with the opportunity to improve his research skills and to fill in other gaps in his training.

Additionally, upon his selection as one of the postdoctoral fellows, petitioner wrote to inquire about his enrollment in several sociology courses to be taught at the university during the 1966–67 school year. This, again, is evidence that he viewed his 9-month sabbatical from Marquette as a period to be devoted to study or research to further his education and training and not as temporary employment.

Not only was petitioner *expected* to work autonomously, doing research and study to improve his own individual capacity, but a look at what he *actually* did during the school year will disclose that he, in fact, was on his own. Petitioner's efforts were directed entirely to coursework, as a student, reading, and some writing, the products of which were published in professional magazines. He also edited a book and participated in a symposium on "Problems Related to the Development of Theory in Administration." These activities impress us as being entirely, or at the very least primarily, for the benefit of petitioner. There was little or no return to the CASEA program other than strictly incidental benefits. Petitioner spent very little time with the permanent research staff and had no close contact with the formal research projects of CASEA. Thus, we are unable to ascertain any significant benefits to the university, past, present, or future, which actually resulted from petitioner's activities.

The cases and facts upon which respondent relies for his arguments can all be distinguished or explained so as not to deny petitioner the exclusion. At trial, counsel for the respondent placed heavy emphasis on the fact that Vaccaro competed with other applicants for the fellowship appointment. It was further pointed out that topics of proposed research projects were an important consideration in the final selection of the six postdoctoral fellows. We find both points to have no better than a neutral effect on our decision. Scholarship and fellowship grants can be the subject of competition much like employment. Both the prospective employer and the educator have a right to invest their money, whether as wages or academic grants, in the best talent available. Furthermore, the nature of the payments is not changed merely because the university screened the applicants' research topics. It appears to us that the procedure was most probably designed to make certain that people with similar professional interests were given access to the money.

The bookkeeping procedures employed by the university to make the stipend payments to petitioner, plus consideration of the ultimate source of fellowship funds, present strong circumstantial evidence that petitioner was a university employee. Nevertheless, we find this evidence deceiving. Normal fellowship disbursement procedures could not have been used to make the HEW funds available to petitioner because of the very requirements written into the cost reimbursement contract between the U.S. Office of Education and the University of Oregon. Therefore, to make some of the money available for petitioner's stipend he had to be listed on the school's payroll as a research associate.[6] The University of Oregon, however, was the grantor of the funds for purposes of section 117, *Marjorie E. Haley*, 54 T.C. 642 (1970), and because its personnel may have been using earmarked funds for non-authorized purposes does not change the substance of the fellowship arrangement, which was to provide funds to postdoctoral fellows while they studied and improved their research skills.

The withholding of taxes from the recipients' payments has been held to be indicative of employee status, *Jerry S. Turem*, 54 T.C. 1494 (1970),[7] as has a requirement that the recipient file periodic progress reports on his work, *Howard Littman*, 42 T.C. 503 (1964). In petitioner's case, the inferences are not valid for there was a reason for each of the procedures. Both the withholding tax and the progress reports were formalistic measures required under the HEW contract to make the funds available for Vaccaro. Furthermore, withholding Federal income tax from the checks was appropriate since petitioner's stipend exceeded the allowable section 117 exclusion of $300 per month. Finally, the Commissioner's own regulations, section 1.117–4, Income Tax Regs., state that because a recipient must file progress reports with the grantor or because the grantor may gain incidental benefits from his work, does not change the essential character of the grant if it is primarily for the recipients' benefit.

Likewise, we find that petitioner's right to full faculty privileges does not, of itself, make him a university employee. It is not extraordinary that petitioner received these gratuities as part of his fellowship. Certainly, with his education he was a professional peer of the university faculty and because CASEA wanted to attract highly qualified individuals to participate in the fellowship program it seems logical that it would make its benefits as generous as possible. Moreover, allowing petitioner to participate in university group life and

---

[6] Pellegrin testified that many of the postdoctoral fellows receiving university funds were added to the payroll as research associates to facilitate getting them the stipend money, since there was no official school rank "postdoctoral fellow" for purposes of university bookkeeping.

[7] See also *Beulah M. Woodfin*, T.C. Memo. 1972–49.

medical care plans or counting his fellowship term for purposes of longevity placed no additional financial burden on the university.

We are not persuaded by respondent's attempts to make petitioner's case analogous to the facts in *Howard Littman, supra.* The distinguishing factor in *Littman* is that there the grantor was unquestionably paying for the taxpayer's services. Had the taxpayer not been present, the grantor would have been forced to hire an employee to perform his duties. In the instant case, the benefits of petitioner's work were for the whole national academic community and not just the University of Oregon. Petitioner's absence from the program would not have necessitated the assumption of his work by other university personnel.

*Decision will be entered for the petitioners.*