ROBERT W. CARROLL AND BERENICE A. CARROLL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3127–71, 336–72. Filed April 23, 1973.

*J. Nelson Young*, for the petitioners.
*Walter T. Thompson*, for the respondent.

SIMPSON, *Judge:* The respondent determined deficiencies in the petitioners' Federal income taxes of $230.67 for 1965 and $265.85 for 1967. The issue for decision is whether payments received by a principal investigator in connection with research performed by him under a basic research grant by the National Science Foundation are excludable fellowship grants within the meaning of section 117(a) of the Internal Revenue Code of 1954.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Robert W. Carroll and Berenice A. Carroll, are husband and wife, who maintained their legal residence in Urbana, Ill., at the time their petitions were filed in this case. They filed their joint Federal income tax returns for the years 1965 and 1967 with the district director of internal revenue, Springfield, Ill. Mr. Carroll will be referred to as the petitioner.

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.

In 1959, the petitioner received his Ph. D. degree, and in 1959 and 1960, he received a postdoctoral grant from the National Science Foundation (NSF) to study further. In September 1960, he was appointed assistant professor at Rutgers University, New Brunswick, N.J., and in 1963, he was promoted to associate professor at Rutgers. While at Rutgers, he was the principal investigator on a research project entitled "Differential Equations," which was supported by a basic research grant of NSF designated GP–1448. He is the author or coauthor of 42 articles upon abstract mathematical theories and problems which have been published in various mathematical journals in the United States and foreign countries. He is also the author of a book entitled "Abstract Methods in Partial Differential Equations." During the years 1965, 1966, and 1967, he was not a candidate for any degree.

Effective September 1, 1964, the petitioner was appointed to the faculty of the Department of Mathematics of the University of Illinois (university) at Urbana, Ill., as an associate professor of mathematics. From September 1964 through August 1968, he was employed by the university under yearly contracts which provided for full-time services during the academic year from mid-September to mid-June. His salary under these contracts was paid in 12 equal monthly amounts over the period September through August of each year.

During the academic year, the petitioner's services included teaching one course for undergraduates and one for graduate students during each semester. He also advised students in the graduate program, served on departmental committees, and engaged in independent research. During the academic year, such research was performed either in the course of the schoolday or in the evenings.

The petitioner's appointment to the faculty of the university was subject to the statutes and rules of the university, some of which related to the performance of research. Section 39(a) of the university statutes provides in part:

(a) It is the policy of the University to maintain and encourage full freedom, within the law, of inquiry, discourse, teaching, research, and publication and to protect any member of the academic staff against influences, from within or without the University, which would restrict him in the exercise of these freedoms in his area of scholarly interest. * * *

Section 37(d) of such statutes sets forth as one of the responsibilities of a full-time member of the faculty of the university the performance of "an appropriate amount of productive scholarly research." Section 35(e) of such statutes provides that "research ability and achievement" are to be considered in appointing, promoting, and determining the salary of the academic staff. Section 54 of such statutes reiterates that it is the university's policy to encourage research by members of

its faculty and that to further such policy, the university will endorse and support research projects supported by outside grants, but because the performance of research may involve indirect costs to the university, all such research must be integrated with the university's program. Under the university rules, members of the faculty are authorized to make preliminary arrangements for the conduct of research projects, but the acceptance of such a research project on behalf of the university can only be performed by a duly authorized official of the university. Members of the faculty of the mathematics department of the university were expected to perform research or to make a similar public contribution.

Section 26 of the university's rules provides that teachers are generally free during the summer months and between academic years to accept other employment in the university or elsewhere, except that they may be called upon to perform administrative responsibilities in connection with registration or other activities. A member of the academic staff who accepts employment with the university during the summer session or performs research receives for each month of such service additional compensation equal to one-ninth of his compensation for the preceding academic year.

The National Science Foundation is an agency of the United States authorized and directed to initiate and support basic scientific research programs and programs to strengthen scientific research potential in the mathematical and other sciences. Pursuant to such authorization, NSF established a program of making grants to support basic scientific research. NSF is also authorized to award scholarships and fellowships within the limit of funds made available for such purpose. Pursuant to such authorization and to promote science, NSF maintained a program of making fellowship grants to postdoctoral applicants who have demonstrated ability and special aptitude for advanced training in the sciences.

A proposal requesting a grant in support of basic research is usually prepared by the scientist who wishes to perform such research. Ordinarily, it is submitted on his behalf by an educational institution or other nonprofit organization, although there are occasional special circumstances in which the proposal is submitted by an individual. After receipt of the proposal, NSF submits it for review by specialists in the field of research, who are asked to appraise the proposal as to the merits of the proposed research and the qualification of the proposed principal investigator. The qualification of the investigator is critical to the acceptance of the proposal. If NSF decides to support the proposed research, the grant is ordinarily made to the educational institution or nonprofit organization. A grant in support of basic research is made because NSF decides that the results of the research

are desired and in the public interest. A grant for basic research sets forth the budget to be followed, including the allocation of the amounts to be paid as salary to the principal investigator and others working on the project. On the other hand, a fellowship grant is always made to an individual and is awarded to enhance the applicant's competence. Although a recipient of a fellowship grant may engage in research as an incident of his study and development, the objective of the grant is to further his study and not to achieve the research.

On December 10, 1964, the university submitted to NSF a research proposal prepared by the petitioner and entitled "The Structure of Abstract Differential Boundary Value and Cauchy Problems." The proposed budget for the project was $16,188 and included proposed salary for the petitioner for his full-time services during 2 months in each of the summers of 1965 and 1966 in the amount of $5,036. On April 8, 1965, the university submitted a revised budget for the project of $8,732. In a letter dated May 12, 1965, NSF awarded a grant of $8,700 to the university, identified as GP–4575, "for the support of research entitled 'The Structure of Abstract Differential Boundary Value and Cauchy Problems,'" such research to be under the direction of the petitioner as principal investigator. The grant was effective July 1, 1965, for a period of approximately 2 years. The attached budget provided the sum of $5,036 for the petitioner as salary for full-time services during 2 months in each of the summers of 1965 and 1966. The letter stated that the grant was subject to the conditions, policies, and procedures stated in the pamphlet entitled "Grants for Scientific Research," June 1963 (as amended December 1963) (the NSF pamphlet) and the attached budget.

On November 17, 1966, the university submitted to NSF a research proposal which was prepared by the petitioner and his colleague, Professor T. W. Ting, entitled "Differential Equations." The proposed budget for this project was $94,000 and included three separate projects, one of which was designed by the petitioner as his particular area for research. The proposed budget stated that the petitioner would spend one-third of his time during the academic years beginning in 1967 and 1968 on the project and that the university would contribute his salary for such services to the project; the budget also stated that the petitioner would work on the project full time during 2 months of each of the summers of 1967, 1968, and 1969 and that his salary for such services would be contributed by NSF. On February 24, 1967, the university submitted a revised budget of $46,000 for the project. In response, NSF, by letter dated May 31, 1967, made a grant of $46,000 to the university, identified as GP–7374 (renewal of GP–4575), "for the support of research entitled 'Differential Equations,'" such research to be under the direction of the petitioner and

Professor T. W. Ting. The grant was effective June 1, 1967, for a period of approximately 2 years. The approved budget included the provisions that the petitioner would spend one-third of his time during the academic years on the project, that such services would be paid for by the university, that he would spend full time on the project during 2 months in each of the summers of 1967 and 1968, and that his salary for such services would be paid out of the funds granted by NSF. The letter stated that the grant was subject to the conditions, policies, and procedures set forth in the NSF pamphlet, supplemented by an "important notice" dated January 24, 1966, and the attached budget.

The NSF pamphlet set forth certain policies governing the administration of grants of NSF. As a general policy, NSF recognizes that salaries of faculty members and other personnel associated directly with the research constitute appropriate direct costs, in proportion to the time each expects to devote to the research, but summer salary for a faculty member is generally not reimbursed for more than two-ninths of his regular academic year salary. Research was assumed to be a normal function of faculty members at institutions of higher education, and therefore, compensation for such research was deemed to be included within the regular institutional salary. Grant funds could not be used "to augment the total salary or rate of salary of faculty members of the institution receiving the grant during the period of time covered by the term of faculty appointment." In any research project supported by a basic research grant, the institution was deemed to be the grantee and any work performed by a faculty member of the institution under such a grant was considered to be for the institution. Grant funds could be used to defray the grantee's contributions for employee benefits such as social security or retirement, if, under the grantee's usual accounting practice, such expenses were treated as direct costs. And finally, a grant could not be transferred from one institution to another. Thus, in the event the principal investigator transferred his institutional affiliation and desired to continue his research, he would be required to have the original grant revoked and a new proposal initiated through his new institution.

The "important notice" of January 24, 1966, provided that after March 1, 1966, institutions were to demonstrate their cost-sharing with respect to NSF-supported basic research. The notice provided:

Research is one of the normal functions of institutions of higher education and is an essential component of graduate education. Therefore the National Science Foundation has always regarded NSF-supported research at colleges and universities as a joint enterprise of the institutions and the Foundation. Since the faculty is an intrinsic part of the educational institution and research a natural function of the faculty, it appears that the provision of faculty time is a particularly appropriate contribution of an educational institution towards the support of basic research.

In an attached circular of the Bureau of the Budget, it was indicated that educational institutions were expected to continue sharing in the costs of research supported by NSF.

The university duly accepted NSF grants GP–4575 and GP–7374. Funds received by the university from such grants were deposited in a common bank account that was maintained for grants, gifts, and trust funds received by the university. The funds received and disbursed under GP–4575 and GP–7374 were accounted for in a separate ledger account for each grant. All disbursements by the university under GP–4575 and GP–7374 were made in accordance with the terms of each grant, and the university filed the required fiscal reports with NSF.

Payments were made by the university to the petitioner for research under GP–4575 during the summer of 1965 in the aggregate amount of $2,444.44. These payments were made pursuant to an executed university form captioned "Recommendation for Appointment of Temporary Academic Staff." This agreement between the university and the petitioner specified that payments thereunder would be made from NSF GP–4575. The petitioner accepted employment subject to the terms of this agreement. The payments which were made in three installments during the summer of 1965 applied only to research work performed by the petitioner during the months of July and August 1965.

Payments were made by the university to the petitioner for research under GP–7374 during the summer of 1967 in the following amounts: June, $694.44; July, $1,388.88; and August, $694.44. These payments were made pursuant to an executed form entitled "Notice of Employment." This agreement between the university and the petitioner covered the period beginning June 16, 1967, and ending August 15, 1967, and specified that payments thereunder would be made from NSF GP–7374. The petitioner accepted employment for the summer of 1967 subject to the terms of this agreement.

In each of the years 1965 and 1967, the petitioner actually performed research, in his home, in accordance with the proposals submitted to NSF. As a principal investigator on the project, the petitioner was in charge of his own work, and such work was not under the direction or supervision of anyone else. Under the terms of the NSF grants, the petitioner was required to file final reports of the research with NSF, but the publication of the results of the research was within his control, subject only to the requirement that any publication acknowledge NSF support of the research. The petitioner filed the required reports and, in various articles, published the results of the research performed under NSF grants GP–4575 and GP–7374.

In each of the years 1965 and 1967, the petitioner received payments

under the grants which equaled two-ninths of his salary for the previous academic year. The university withheld Federal income taxes from such payments and also made payroll charges for the university retirement system and for workmen's compensation. All employee benefits of the university continued to be available to the petitioner during these periods.

In years other than 1965 and 1967, the petitioner treated amounts as excludable under section 117(b)(2) for 19 months.

In his Federal income tax return for each of the years 1965 and 1967, the petitioner claimed an exclusion of $900 under section 117(b)(2), representing the receipt of a fellowship grant for 3 months in each of such years. The respondent disallowed the exclusions and also certain deductions which were claimed in the return for 1965 and which have not been challenged by the petitioner. The petitioner has conceded that, in 1965, the exclusion is limited to $600.

OPINION

The issue for decision is whether payments received by a principal investigator in connection with research performed by him under a basic research grant by the National Science Foundation are excludable fellowship grants within the meaning of section 117(a). The petitioner recognizes that since he was not a candidate for a degree in 1965 or 1967, any exclusion by him is limited to $300 for each month in which he received a payment of a fellowship grant. Sec. 117(b)(2)(B). He contends that the payments which he received in 1965 and 1967 under the NSF grants constituted fellowship grants and that he is entitled to exclude $600 of such payments in 1965 and $900 of such payments in 1967. The respondent takes the position that such payments were taxable compensation and that no part is excludable under section 117.

Section 117(a) excludes from gross income any amount received as a scholarship or fellowship grant. Although the statute fails to define these terms, a definition is provided by the respondent in his regulations. Section 1.117-3(c) of the Income Tax Regulations provides:

A fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research. * * *

In addition, section 1.117-4 of such regulations states:

The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117:

*        *        *        *        *        *        *

(c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.* (1) * * * any amount paid or allowed to, or on behalf of, an

individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.

However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragrah. Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant.

Thus, under such regulations, the distinction between a fellowship grant and a payment of compensation turns on whether the primary purpose for making the grant was to enable the recipient to pursue study or research to further his education or training in his individual capacity or whether the primary purpose was to compensate him for past, present, or future services.

The Supreme Court has upheld the validity of section 1.117-4(c) of the regulations and has stated that the definition provided by such section properly comports with the ordinary understanding of the term "scholarship" or "fellowship grant" as "relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial *quid pro quo* from the recipients." *Bingler* v. *Johnson*, 394 U.S. 741, 751 (1969).

Section 117 was enacted in 1954 to set forth rules to determine the extent to which scholarship and fellowship grants were to be excluded from gross income. *Elmer L. Reese, Jr.*, 45 T.C. 407, 412 (1966), affirmed per curiam 373 F. 2d 742 (C.A. 4, 1967). The report of the House Ways and Means Committee accompanying H.R. 8300, 83d Cong., 2d Sess. (1954), states:

The bill provides that amounts received as scholarships or fellowships are excludable from gross income, but *the exclusion is not to apply to * * * (2) in the case of individuals who are not candidates for degrees, amounts received as grants which in effect represent a continuing salary* during a period while the recipient is on leave from his regular job. * * * [H. Rept. No. 1337, 83d Cong., 2d Sess., pp. 16–17 (1954) ; emphasis added.]

In the case of grants to nondegree candidates, the House bill provided that the grant was excludable only if the annual amount, plus any compensation received from the recipient's previous employer, was less than 75 percent of the recipient's salary in the preceding year. The report went on to state at page 17:

*This will tax those grants which are in effect merely payments of a salary during a period while the recipient is on leave from his regular job.* Hence, in the case of persons who have completed their formal education and are continuing to teach or carry on research as part of their life work, the grant will be excluded only if it is merely a supplement to the individual's own funds which make it possible for him to carry on research or further his educational development. [Emphasis added.]

The Senate Finance Committee amended the method adopted by the House and substituted for the 75-percent rule the present version of section 117(b)(2)(B) providing the limitation of $300 per month for 36 months. In so doing, it stated:

The House bill provided a specific standard for determining the taxability of grants received by individuals who are not candidates for a degree, typically the recipients of post doctoral fellowships. Such grants may be in effect a continuing salary payment while the recipient is on leave from his regular job. * * * Cases were brought to your committee's attention in which *the formula of the House bill would tax grants which were clearly not a continuing salary payment.* In many of these cases taxability would result from the absence of a substantial earned income in the previous year. * * * [S. Rept. No. 1622, 83d Cong., 2d Sess., p. 18 (1954) ; emphasis added.]

The petitioners suggest that this legislative history demonstrates that Congress intended for a different test to be applied in determining the excludability of grants to those who were not candidates for a degree. They argue that when the Senate changed the House rule, it abandoned any effort to distinguish between compensatory and noncompensatory payments—it recognized that the payments to those who were not candidates for a degree might be compensatory and allowed a limited exclusion of such payments. They assert that since the payments to an individual who is a candidate for a degree are excludable without limit, there is reason for not allowing the exclusion of such payments when they are compensatory, but that since the payments to a person who already has his degrees may be excludable only to a limited extent, there is not the same need to determine whether the payments are compensatory.

The distinction suggested by the petitioners is not supported by the legislative history and has been rejected by the regulations and the courts. The Senate apparently abandoned the 75-percent test merely because it would cause some noncompensatory payments to be taxed as compensation, but the words of the Finance Committee report do not indicate any intention to allow even the limited exclusion for compensatory payments. To adopt the interpretation proposed by the petitioners would result in allowing a limited exclusion for payments by the organizations described in section 117(b)(2)(A) to all individuals performing research for compensation. The definitions set forth in sections 1.117–3 and 1.117–4 of the Income Tax Regulations

make no distinction between grants to individuals who are candidates for a degree and those who have received their degrees—in any event, a compensatory payment is not treated as a scholarship or fellowship grant. Similarly, a host of decisions have held that compensatory payments to individuals who are not candidates for a degree are taxable and not at all excludable under section 117(b)(2). *Parr* v. *United States*, 469 F. 2d 1156 (C.A. 5, 1972); *Hembree* v. *United States*, 464 F. 2d 1262 (C.A. 4, 1972); *Quast* v. *United States*, 428 F. 2d 750 (C.A. 8, 1970); *Woddail* v. *Commissioner*, 321 F. 2d 721 (C.A. 10, 1963), affirming a Memorandum Opinion of this Court; *Robert W. Willie*, 57 T.C. 383 (1971); *Frederick Fisher*, 56 T.C. 1201 (1971); *Irwin S. Anderson*, 54 T.C. 1547 (1970); *Aloysius J. Proskey*, 51 T.C. 918 (1969); *Ethel M. Bonn*, 34 T.C. 64 (1960); *Frank Thomas Bachmura*, 32 T.C. 1117 (1959). In fact, the legislative history indicates that when an individual who has completed his formal education continues to perform research and has his salary continued during such time, the exclusion is not to apply to such a salary continuation payment.

A careful analysis of all the circumstances of this case convinces us that the payments received by the petitioner during the summers of 1965 and 1967 out of the funds provided by NSF constitute compensation. The NSF pamphlet regarding basic research grants indicated that NSF funds could not be used to supplement the salary of a faculty member for work performed during the academic year; but the grant might include a payment of salary for the research to be performed by the principal investigator during the summers and limited the amount that could be so paid. The research proposals which were prepared by the petitioner and which led to both grants GP–4575 and GP–7374 included a provision for paying him salary for his full-time work on the projects during the summer months, and the budgets approved by NSF for those research projects included as salary for the petitioner the amounts proposed by him. The proposal and the budget for GP–7374 also indicated that one-third of his time during the academic years beginning in 1967 and 1968 would be spent performing research on the project and that the university should compensate him for such services. He recognizes that his payments for such services from the university are taxable, and we perceive no basis for distinguishing those payments for his services on the research project from the payments that he received out of the funds made available by NSF. In connection with his services during the summers of 1965 and 1967, the petitioner executed employment agreements with the university, and for all purposes, he was treated as an employee of the university during such periods—he received payments at the same monthly rate as he had received during the preceding academic year; contributions to the university retirement system were made on his behalf; and he

was covered by the workmen's compensation plan and was entitled to all other benefits applicable to employees of the university. Thus, both NSF and the university treated the payments as salary for services performed.

The petitioners urge us to look to the substance of the transaction and not to be guided by its formalities. The procedures adopted by both NSF and the university for handling the payments to the petitioner indicate that their purpose was to compensate the petitioner for his work on the project, and we find that the substance of the transactions is not inconsistent with those indications. The parties spent a good deal of time arguing over whether NSF or the university benefited by the research performed by the petitioner; the truth is that both participated in making possible the research and both derived some benefit from it. In *Jerry S. Turem*, 54 T.C. 1494, 1505–1506 (1970), we held that where the State and county governments participated in a joint enterprise to improve the quality of social services available to the needy and accordingly established a training program in which county employees were given educational leave during which time they received a stipend from the State government, both the State and the county benefited and, therefore, both may be considered the grantors of the stipend. We reach the same conclusion here. NSF seeks to further research which it finds to be in the public interest. Because it found that the research proposed by the petitioner met that standard, NSF made funds available to support such research. The university is interested in encouraging the members of its faculty to perform research, and for that reason, it undertook to administer the grant made by NSF and to make its facilities available for the performance of such research. The research grants were the results of joint efforts by NSF and the university to obtain research, and therefore, for purposes of section 1.117–4(c) of the Income Tax Regulations, both may be viewed as the grantors. Since NSF provided the funds out of which the payments in issue were made to the petitioner, selected the petitioner as a recipient, and laid down the terms for making such payments, we must seek the purpose of NSF in making such funds available, for it is that purpose which determines their character. See *Jerry S. Turem*, 54 T.C. at 1505; *Elmer L. Reese, Jr.*, 45 T.C. at 411. Compare *Robert W. Willie*, 57 T.C. at 389–390, and *Frederick Fisher*, 56 T.C. at 1214, where the institutions administering the grants were given wide latitude in controlling the program or in selecting the recipients of the stipends and, therefore, were considered by this Court to be the grantors.

Although the research was proposed by the petitioner, NSF had to decide whether the proposed research was worthwhile and whether NSF should support it. The proposal was reviewed by NSF and its advisers to determine whether it had merit and whether the petitioner

was qualified to perform the research. The ultimate decision as to whether a grant should be made turned on whether the research should be performed. The petitioner's qualification to perform the research was of critical importance, because NSF had to be assured that if it supported the project, he was capable of performing the suggested research. NSF was not concerned with whether the research would further the development of the petitioner; if it did, that was merely an incidental byproduct. Once NSF decided that the proposed research was worthwhile, it made a grant to support that research; to carry out its public responsibilities, it decided that such research should be performed. Accordingly, the raison d'être of NSF was facilitated when the grant was advanced and the research performed. See *Aloysius J. Proskey*, 51 T.C. at 925; *Ethel M. Bonn*, 34 T.C. at 73.

Obviously, the petitioner had a great deal of latitude in deciding when and how the work should be performed, but both he and the university were required to use the funds provided by NSF in accordance with the approved budget and applicable rules and regulations. According to the budget, payments were to be made to the petitioner for his full-time services on the projects during 2 months of each summer. He performed the research described in the proposals. In making the payments to the petitioner, the university acted in reliance upon his representation that he was entitled to receive the payments. In the light of these circumstances, we find that NSF made the funds available to be paid to the petitioner because it wished to have the research performed and to have him perform it, and that the university made the payments to the petitioner because it believed that they were due to him for the services that he performed on the research project.

NSF had a program of making fellowship grants to individuals, but the standards for making such a grant were different. In deciding whether to make such a grant, NSF is concerned with the training of an individual and whether the proposed study will develop his competency. Thus, the purpose in making a fellowship grant is quite different than the objective in supporting proposed research.

The petitioner's control over the publication of the results of the research does not establish that the grants were made for his benefit. A consideration of all the evidence shows clearly that NSF provided the support because it wished to have the research performed; it apparently assumed that the results would be made available to the public by the petitioner, and he did in fact publish the results.

This case is distinguishable from *Louis C. Vaccaro*, 58 T.C. 721 (1972). In that case, the payments to the taxpayer were recorded as payments for services rendered by him, but the evidence in the case showed clearly that the taxpayer was not in fact required to perform any services for the benefit of the university or the Department of

Health, Education, and Welfare which provided the funds. Instead, he was allowed to pursue a program of education and research designed to further his own training. Although the petitioner in the case before us may have derived some personal benefit from the research performed by him, he was required under the terms of the NSF grants to perform the research proposed by him and described in those grants, and he fulfilled that obligation.

The petitioners rely on our decision in *Clarence Peiss*, 40 T.C. 78 (1963), and on Rev. Rul. 62–188, 1962–2 C.B. 42, but they are inapposite. In *Peiss*, this Court found, on the basis of all the circumstances of that case, that the grant was made to the taxpayer to further his education and training. A similar conclusion was reached by the Internal Revenue Service in Rev. Rul. 62–188 based on the facts presented therein. However, the primary purpose for making a grant is a question of fact. *Thomas P. Phillips*, 57 T.C. 420, 425 (1971); *Robert W. Willie*, 57 T.C. at 387; *Stephen L. Zolnay*, 49 T.C. 389, 395 (1968). Under the circumstances of this case, we have found that the grants were made by NSF in order to have performed the research proposed by the petitioner.

*Decisions will be entered for the respondent.*