NICHOLAS VICTOR FINDLER and CATHERINE FINDLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Findler v. Commissioner
Docket No. 6363-75.
United States Tax Court
T.C. Memo 1976-352; 1976 Tax Ct. Memo LEXIS 49; 35 T.C.M. (CCH) 1602; T.C.M. (RIA) 760352; November 22, 1976, Filed Nicholas Victor Findler, pro se. David R. Smith, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Jedge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1972 in the amount of $378.88. The issue for decision is whether amounts received by petitioner Nicholas Victor Findler from the Research Foundation of the State University of New York from funds provided under a National Science Foundation grant constituted a scholarship or fellowship grant within the meaning of section 117(a), I.R.C. 1954. [1]
FINDINGS OF FACT
Some of the facts have been stipulated and are found accordingly. *50 Petitioners, husband and wife, who were residents of Snyder, New York, at the time of the filing of their petition in this case filed a joint Federal income tax return for the calendar year 1972 with the Internal Revenue Service Center at Andover, Massachusetts. During the year 1972 and for some years prior thereto Nicholas Victor Findler (petitioner) was a professor in the Department of Computer Science at the State University of New York at Buffalo (the university) and was also the Director of Graduate Studies at that institution. Petitioner was not a candidate for any scholastic degree during the year 1972. On April 5, 1969, the Research Foundation of the State University of New York, Albany, New York (the grantee institution) submitted to the National Science Foundation (NSF) a proposal for a research project to be conducted under the auspices of petitioner as principal investigator, requesting a grant to fund the project. The research proposal submitted by the grantee institution stated that it was submitted in behalf of the university, that the principal investigator was petitioner, and that the title of the proposed research was "Extensions to and Applications of *51 an Associative Memory, Parallel Processing Language, AMPPL." The proposed starting date was stated to be July 1, 1969, the proposed duration 2 years, and the amount requested $67,404. The proposal stated that the research would be conducted at the university and contained an outline of the proposed project. It described the facilities available at the university for use in the project and a detailed resume with respect to petitioner. The resume showed that petitioner had both a B.E. and a Ph.D. degree, that he had held a number of positions as professor at various universities, as well as research positions, that he had won a number of prizes and fellowships, had published a number of articles, many of them dealing with computer studies, and had published two books. The budget contained in the research proposal indicated that of the $67,404 requested the university's contribution would be $6,740, part of which was a percentage of the salary of the principal investigator, petitioner. The staff summary contained in the "Proposal Review Summary and Program Recommendations" prepared by a program director of NSF with respect to the research proposal submitted by the grantee institution *52 stated as follows Several proposals for construction of associative memory and parallel processing machines have been made and one or two are being constructed but a major barrier has been the design of appropriate programming languages. This constitutes a conceptual as well as practical barrier since it is difficult for people to visualize the application of parallel processing and associative memory to a wide range of problems. Prof. Findler is attacking precisely this problem and should be supported. Under date of August 14, 1969, the grantee institution received a letter from NSF stating that a grant of $54,200 was made with respect to the proposal and that the foundation required that the grant be administered in accordance with "Grants for Scientific Research," June 1963 (as amended December 1963 and supplemented by Important Notice of January 24, 1966), and the approved budget summary. On December 15, 1970, the grantee institution submitted to NSF a supplementary research proposal requesting an extension of the original research grant. This supplemental proposal was likewise submitted on behalf of the university with petitioner as principal investigator. The title of *53 the proposed research was stated to be. "Further Studies Using the Associative Memory, Parallel Processing Language, AMPPL-II." The starting date proposed was September 1, 1971, the proposed duration 3 years, and the amount requested $357,713. This supplemental research proposal set forth a summary of the work which had been done over the last 18 months using the support of NSF and activities which were currently being undertaken. This supplemental proposal also contained a resume of petitioner, the principal investigator, and a proposed budget. The proposed budget showed that the university contribution in connection with the projects described would be made in accordance with NSF Notice No. 31, "Cost Sharing on Research Projects," and that the university contribution included a portion of the salary of the principal investigator. Under date of January 19, 1972, the grantee institution received a letter from NSF stating that an additional $150,500 was granted for renewed support of the project entitled "Associative Memory, Parallel Processing Language, AMPPL-II" as outlined in the supplemental proposal. The letter stated that the funds were intended to support the project for *54 an additional 24 months. This letter further stated: The Foundation shall have the right to require the grantee, at no cost to the grantee, to duplicate, or permit others to duplicate, and deliver to the Foundation or to any person designated by the Foundation, any computer programs, instructions or other software produced under this grant, which may, in the opinion of an authorized Foundation official, be useful for research, education or other legitimate purposes by others; provided that no such requirement shall be imposed without affording the grantee a reasonable opportunity to correct errors or to document errors and ambiguities therein. Except as modified by this amendment, including Enclosure R-12, the grant conditions remain unchanged. Enclosure R-12 stated that the grant should be administered in accordance with Part II of NSF 69-23, "Grants for Scientific Research," as modified by NSF Important Notice No. 40 and by the enclosure. Enclosure R-12 provided, with respect to patents and inventions, that whenever any invention which is or may be patentable is conceived or first actually reduced to practice in the course of the grant, the grantee shall furnish the foundation *55 with complete information thereon and the foundation shall have the right to determine whether or not and where a patent application shall be filed and to determine the disposition of the invention and title to and rights under any application or patent that may result. NSF 69-23, referred to in the enclosure with the letter approving the grant for the research to be done by petitioner, stated that NSF was authorized to initiate and support scientific research and programs to strengthen scientific research potential. The further statement was made that the guide contained instructions for submitting research proposals and referred to other projects supported by NSF. NSF 69-23 stated that proposals were normally initiated by the scientist interested in doing the work and submitted on his behalf by his organization, and that most proposals received by NSF are submitted by universities and colleges on behalf of their staff members. It further stated that the principal investigator is responsible for direct supervision of the project and will participate in the research whether or not his institution is to receive any reimbursement of his salary from grant funds and that, as a general *56 policy, NSF recognizes that salaries of tenured and non-tenured faculty members associated with the research constitute appropriate direct costs in proportion to the time devoted to the research. It is further stated that the summer salary for a faculty member generally would not be reimbursed for more than two-ninths of his academic salary. NSF 69-23 contained the following statement: The Foundation regards research as one of the normal functions of faculty members at institutions of higher education. Compensation for time spent on research within the term of appointment is deemed to be included within the regular institutional salary of the faculty member. Therefore, grant funds may not be used to augment the total salary or rate of salary of faculty members during the period of time covered by the term of faculty appointment or to reimburse faculty members for consulting or other time in addition to a regular full-time institutional salary covering the same general period of employment. In any Foundation supported scientific research grant, the institution is deemed to be the grantee and responsibility for work performed by a faculty member under such a grant rests with the *57 institution. NSF 69-23 further stated that scientists serving as members of the NSF staff review and evaluate all proposals submitted to NSF and that in general proposals would be supported in order of merit to the extent permitted by available funds. NSF 69-23 further provided: Primary responsibility for general supervision of all grant activities rests with the grantee institution; the principal investigator is responsible for the scientific work. Grantees and principal investigators are encouraged to seek advice and opinion from the Foundation on problems that may arise. * * * * * *
The grant letter includes a budget summary which lists the items for which funds are provided. The grant is made to the investigator's institution and it is the institution which bears the primary responsibility for fiscal accountability. * * * * * *
The Foundation believes that the principal investigator, operating within the established policies of the grantee institution, should feel free to pursue interesting and important leads which may arise during the conduct of the research. * * * However, on occasions when new and promising leads or fruitless lines of inquiry do arise, *58 leading to possible major deviations from original research objectives, the Foundation must be informed. NSF 69-23 also set forth the reports required by the NSF which included short annual technical reports and interim fiscal reports.It stated that NSF does not transfer grants from one institution to another and in the event a principal investigator changes his official affiliation a new proposal through the new institution must be initiated. NSF 69-23 specifically provided for special approval for purchase of permanent items costing in excess of $1,000, foreign trips, and changes involving senior personnel in the project. Also, the right to use published material resulting from the performance of the research was reserved to the United States Government. During the first half of 1972 petitioner performed his normal teaching and administrative duties at the university while working on the project for which a grant was received from NSF. During this period none of petitioner's salary was reimbursed to the university through the NSF grant. From June 27, 1972 throughout the end of that year petitioner was on sabbatical leave from the university. He spent this entire period *59 in various European cities where he was engaged in work on the research project approved by NSF of which he was principal investigator. For the period June 27, 1972 to December 31, 1972, petitioner received $11,268.98 of which $5,628.98 was paid to him by the university and $5,640 was paid to him by the grantee institution with funds provided by NSF under the research grant. The $11,268.98 represented petitioner's then current salary from the university for a 6-month period, with one-half being paid by the university and the other half under the research grant. Petitioner continued to participate in the retirement program of the university during the last 6 months of 1972 and also in the university-sponsored hospitalization and group health program. Federal and State income taxes and Social Security taxes were withheld from all payments which petitioner received during the last 6 months of 1972, including those received from the grantee institution from funds provided under the NSF grant. Petitioner received both his salary payments from the university and his payments from the grantee institution every 2 weeks during the period June 27, 1972 through December 31, 1972. During *60 1972 petitioner was assisted in his research carried on in accordance with the grant proposal by four graduate students. Provision for participation by these graduate students had been made in the NSF budget awarding the grant.During the period June 27, 1972 through the end of that year petitioner performed none of his regular services for the university. Petitioners on their Federal income tax return for the year 1972 deducted $1,800 from their total reported income with the explanation that one-half of the amount received by petitioner during the last 6 months of 1972 had been a "postdoctoral fellowship." Respondent in his notice of deficiency increased petitioners' income by $1,800 with the explanation that the amount of $1,800 excluded by petitioners from income as a fellowship grant "is not allowable since the stipends received with respect to the National Science Foundation Grant represent compensation for services rendered and do not qualify under Section 117 of the Internal Revenue Code of 1954." OPINION Section 117 provides that gross income of an individual does not include amounts received as a fellowship grant. In the case of individuals *61 who are not candidates for a degree the amount of the fellowship grant whichmay be excluded from income is limited to $300 times the number of months for which the recipient receives amounts under the grant. Section 1.117-4, Income Tax Regs., lists certain items which are not considered as fellowship grants. One of these items is amounts paid as compensation for services or primarily for the benefit of the grantor. Under this regulation, amounts representing compensation for past, present or future employment services or for services which are subject to the direction or supervision of the grantor, or amounts paid to an individual to enable him to pursue studies or research primarily for the benefit of the grantor are not considered excludable fellowship grants. The validity of these provisions of the regulations was upheld in Bingler v. Johnson,394 U.S. 741, 751 (1969). Petitioner takes the position that the payments he received through the grant made by NSF for the research proposal on which he was working were not in the nature of compensation within the meaning of respondent's regulations since he made the proposal of the project, and his activities in *62 conducting the research under the proposal were in no way directly supervised.Petitioner stresses the fact that during the last 6 months of 1972 he was carrying on his research in Europe and not on the campus of the university. Respondent takes the position that research is an expected part of a professor's work and that NSF sponsored the research on the project on which petitioner was working because of its interest in having that research work done. Respondent argues that the facts here show that petitioner was rendering services in doing research during the last 6 months of 1972 for which services he was compensated from the NSF grant funds. Respondent contends that since the payments petitioner received from the NSF grant were compensation for services rendered, petitioner is not entitled to the exclusion from income which he claimed as a fellowship grant. Both parties cite a number of cases and revenue rulings involving claimed deductions for scholarship or fellowship grants. Some of the cases cited by each of the parties deal with scholarships or fellowships granted to candidates for a degree and others deal with persons serving as residents or interns in hospitals. *63 One of the rulings cited by petitioner deals with a professor doing research on sabbatical leave, but under factual circumstances totally distinguishable from those here present. Suffice it to say that except for the case of Robert W. Carroll,60 T.C. 96 (1973), none of the cases cited by either party deal with facts comparable to those here present. Since, in our view, there is no substantive distinction between the facts in the Carroll case and those in the instant case, no useful purpose would be served in discussing and distinguishing the numerous other cases cited by the parties. The facts in the Carroll case are exactly the same as those in the instant case except that the payments to the taxpayer in that case from funds from an NSF grant were for summer work in the taxpayer's home rather than as here for work in Europe while petitioner was on sabbatical leave. The NSF grant from which the taxpayer in the Carroll case received payments was for a project approved under the same NSF program as the grant in the instant case. The taxpayer in the Carroll case was the principal investigator on the project as was petitioner in the instant case. *64 In the Carroll case the taxpayer's project was sponsored by the university by which he was employed as a professor as was petitioner's project in this case. The only distinction that petitioner attempts to make between the case of Robert W. Carroll,supra, and the instant case is that the taxpayer in the Carroll case was doing his research in the location of the university where he was employed as a professor rather than in Europe. Petitioner does not deny that the requirements of NSF with respect to the research proposal in the Carroll case and the instant case were the same or that the criteria governing approval and the standards to be met were the same with respect to the project in the Carroll case and the instant case. It is petitioner's argument that since his work was being carried on in Europe instead of at the facilities of the university, the Carroll case should be held not to be applicable with respect to this case. In the Carroll case, supra at 101, we found that "[in] each of the uears 1965 and 1967, the petitioner actually performed research in his home, in accordance with the proposals submitted to NSF. As a principal *65 investigator on the project, the petitioner was in charge of his own work, and such work was not under the direction or supervision of anyone else." In our view, whether an unsupervised researcher is working in his own home in the city where the university by which he is employed is located or is working in Europe is not an important factor. The important factors are the nature of the work done by the principal investigator, the circumstances under which the principal investigator undertakes the research work, the requirement of the grantor for approval of the project, and the reasons for the approval of the project by the grantor. Therefore, in our view there is no distinction in the Carroll case and the instant case. On the basis of the Carroll case, we hold that the payments received by petitioner in 1972 from funds provided by NSF were compensation.
As we pointed out in the Carroll case, the NSF pamphlet with respect to research grants indicated that NSF funds could not be used to augment the salary of a faculty member for work performed during the academic year, but could include payments of salary for research performed during the summer period or while on sabbatical *66 leave. Substantially the same provisions which we set forth as being in the NSF pamphlet in the Carroll case were in the pamphlet in effect at the time the research project in the instant case was approved. In fact, petitioner testified that had he been paid his full salary by the university while on a 6 months sabbatical in 1972, no funds of NSF under the grant could have been paid to him. The only NSF funds which he could receive was an amount to bring his pay for the 6 months period while he was on sabbatical to the level of the salary which would have been paid him by the university had he not been on sabbatical. Petitioner here recognizes, as did the taxpayer in the Carroll case, that as a professor he is expected to do research. In the Carroll case we called attention to the legislative history of section 117 which made it clear that it was not the intent of Congress that grants which were in effect continuing salary payments to the recipient while on leave from his regular job be considered as fellowship grants. Here, part of petitioner's regular job and part of the activity he undertook during the school year while he was performing his other functions at *67 the university was research on the project for which NSF had made a grant. When he went on sabbatical leave and pursued this research full-time instead of part-time, the nature of his research work was unchanged. He was still pursuing the research as a part of his work as a professor and in accordance with the NSF grant.
Since petitioner in the instant case had so many years of work in the area with which his research dealt, it is not even shown by this record that his education was enhanced by the research he did in 1972. In any event, in this case as in the Carroll case the facts as a whole show that the funds were made available for petitioner's project because NSF wished to have the research performed and to have it performed by him, and that the payments made to petitioner from the NSF funds were for the services he performed on the research project. Here, as in the Carroll case, an essential element of having the research proposal approved was the qualifications of petitioner to perform the important research he had outlined. The grant was made to support the proposed research which NSF determined should be performed. In the Carroll case we stated (at 106): *68 NSF seeks to further research which it finds to be in the public interest. Because it found that the research proposed by the petitioner met that standard, NSF made funds available to support such research. The university is interested in encouraging the members of its faculty to perform research, and for that reason, it undertook to administer the grant made by NSF and to make its facilities available for the performance of such research. This statement is equally applicable in the instant case. Here, as in the Carroll case, petitioner continued to be covered by the employee benefit programs of the university during the 6-month period he was working exclusively on research under the proposal approved by NSF. For the reasons we have stated, as well as all the reasons stated in the case of Robert W. Carroll, we conclude that petitioner is not entitled to the exclusion from income claimed in 1972 for amounts received as a fellowship grant. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, unless otherwise noted.↩