JOHN E. ADAMS AND PHYLLIS E. ADAMS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7047–76.    Filed December 28, 1978.

John E. Adams, pro se.
*Jeff P. Ehrlich,* for the respondent.

FEATHERSTON, *Judge:* The Commissioner determined a deficiency in Federal income tax against petitioners for the taxable year 1973 in the amount of $541. Due to concessions by the parties the issue for decision is whether certain amounts received by John E. Adams during the taxable year 1973 are excludable from gross income as a scholarship or fellowship grant pursuant to the provisions of section 117.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts, the supplemental stipulation of facts, and the exhibits attached thereto, are incorporated herein by this reference.

Dr. John E. Adams (hereinafter petitioner) and his wife, Phyllis E. Adams, who resided in Arvada, Colo., at the time their petition was filed in the instant case, filed a joint Federal income tax return for the taxable year 1973.[2]

Petitioner received a doctor of osteopathy degree from Chicago College of Osteopathic Medicine on June 4, 1972. Following graduation, petitioner embarked on an intern program at the Rocky Mountain Osteopathic Hospital (the hospital) in Denver, Colo., pursuant to a written intern-hospital contract

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

[2] Phyllis E. Adams is a party in this proceeding only by virtue of having filed a joint return with her husband, John E. Adams.

dated April 11, 1972. In this contract, the hospital agreed, among other things, to appoint petitioner to a position as an intern for a 1-year period, July 1, 1972, to June 30, 1973; to pay him a stipend of $1,025 monthly ($875 base pay plus $150 housing allowance); to further his medical knowledge and skill by providing an educational program; and to define his "duties and privileges." Petitioner agreed as follows:

1. To serve as an Intern during the entire period as specified above in this contract.

2. To perform all the duties assigned to him to the best of his ability, to maintain standards of professional competence as determined by the Hospital, and to conduct himself in a professional manner at all times.

3. To observe all rules and regulations of the Hospital and those of the American Osteopathic Association pertaining to Interns.

4. To refrain during the entire period of this contract from engaging or participating in any outside activities of a professional nature.

5. To refrain during the entire period of this contract from engaging or participating in any non-professional activities which would interfere with his effective performance of this contract. [Underscoring omitted.]

Prior to execution, this contract was transmitted by the administrator of the hospital to petitioner with a letter dated April 10, 1972, which included the following:

In accordance with the requirements adopted in July 1967 by the Board of Trustees of the American Osteopathic Association, this letter is attached to and made a part of your contract with Rocky Mountain Osteopathic Hospital as an Intern for the year beginning July 1, 1972 and ending on June 30, 1973. The hospital agrees:

1. To furnish meals, uniforms and personal laundry for the Intern. The Intern will be given a housing allowance of $150.00 monthly, as indicated in Item #4 of the contract. He may select his own living quarters off the hospital premises and will be responsible for all costs in connection therewith, including deposits, utilities and telephone.

2. To furnish liability insurance coverage for the Intern. Under the laws of the State of Colorado, Interns are not licensed. They are considered employees of the Hospital and are only covered by liability insurance as employees.

3. To provide Blue Cross Hospitalization Insurance for the Intern and his family.

4. To supply the Intern with a written copy of the educational program, regulations, privileges and schedules at the beginning of the contract period. [Underscoring omitted.]

The internship commenced on July 1, 1972, and ended on June 30, 1973. From July 1, 1973, to the end of the year petitioner practiced osteopathy as a private physician.

The hospital is a nonprofit institution dedicated to the care and treatment of its patients through the application of osteopathy.[3] The hospital is also involved in the areas of research and teaching. During 1973 the hospital maintained approximately 170 beds with an average daily rate of occupancy of about 125 patients. Approximately 100 osteopathic physicians were admitted to practice at the hospital. In addition, two resident physicians specializing in specific fields of osteopathy practiced at the hospital during the time of petitioner's internship.

The hospital provided a stipend to petitioner in the amount of $875 per month plus $150 per month for a housing allowance. In addition, the hospital provided uniforms, meals while at the hospital, professional liability insurance, and medical and hospitalization insurance. The hospital withheld FICA employee tax, and Federal and State income withholding tax from the amounts received by petitioner.

After petitioner arrived at the hospital to begin his internship, the hospital furnished a manual of rules and regulations for interns.[4] The manual provided a rigid program of assignments which an intern was required to follow. These duties included the following: interns were required (1) to be at the hospital from 7 a.m. to 7 p.m. on a daily basis; (2) to prepare the history of patients; (3) to perform and record the results of physical examinations; (4) to enter a diagnosis on all patients assigned to the intern; (5) to make frequent notes on the record which described the patient's progress; (6) to record all treatment or special diagnostic procedures; and (7) to assume an increasing responsibility until the intern acquired confidence in his clinical judgment in each area of medical care and treatment. In addition, all interns were required under the manual to be at the hospital from 7 p.m. to 7 a.m. every fourth day to take care of emergency cases.

The manual included the following general introductory paragraphs:

In choosing interns, we have tried to select the men best adapted to the

---

[3]Osteopathy is a system of medical practice based on the theory that disease is due chiefly to mechanical derangement in tissues, placing emphasis on restoration of structural integrity by manipulation of the parts. The use of medicines, surgery, proper diet, psychotherapy, and other measures are included in osteopathy.

[4]The manual contained guidelines set forth by the American Osteopathic Association for osteopathic hospitals which had established intern programs.

work here which requires exceptional intellectual ability, basic honesty, and high moral standards. We will expect you to work diligently and at times to do more than an equitable amount of labor.

Every young physician accepting an appointment to hospital service should make it a condition of his acceptance that his work will be honestly and conscientiously done and not interferred with, either by absence or lateness, except in grave emergency.

The regulations contained in this manual represent years of study and experience. They outline the routine which you are expected to follow. They were prepared by the Intern Committee, members of which you are expected to work with individually and collectively during the entire Intern year.

Due to the small number of interns (four) during petitioner's internship, the hospital was required to contract with private physicians to replace the interns during the nighttime hours. As a result, the private physicians took care of emergency cases one night each week. Generally, when an intern was at the hospital during the nighttime he was the only physician in the hospital and thus the first physician to participate in the treatment of emergency patients.

During the daytime, interns were assigned to specific sections of the hospital (i.e., surgery, obstetrics, gynecology, and outpatient care) on a weekly basis. When an intern was assigned to the surgical ward he was required under the manual to visit all patients who were ready for surgery on that particular day. In addition, the intern was required to conduct a physical examination of the patient prior to surgery as well as assist the attending physician during surgery. When assigned to obstetrics and gynecology, an intern was required under the manual to monitor the expectant mothers who were in labor. In addition, an intern was required to assist or actually deliver babies and visit the patient following birth to determine the condition of the baby and the mother. When an intern was assigned to the emergency room during the daytime, he was required to provide care for all minor outpatient injuries.

Notwithstanding the provisions set forth in the manual, the hospital did not follow, in actual practice, the terms of the manual with regard to an intern's duties. When petitioner trained for surgery, he would arrive at the hospital at 7 a.m. and examine the different surgical procedures that had been scheduled and posted in the surgical ward for that particular day. Petitioner would then choose which procedure he wished to observe. After making his choice he would read, as time

permitted, the patient's medical chart to familiarize himself with the physical complications surgery was designed to alleviate. Before petitioner went into the operating room he sought the attending physician's permission. If the attending physician gave his approval, petitioner would observe the attending physician during surgery and in some cases assist in the operation. After surgery petitioner visited the patient (subject to the attending physician's approval) and observed his or her recovery. In addition, petitioner accompanied the attending physician when he treated the patient who was recovering from surgery. In the event petitioner decided not to observe surgery, he would attend a lecture.

During the time petitioner trained in the area of obstetrics, he monitored the condition of women in labor. Each time this occurred a nurse employed by the hospital was present and if petitioner chose to attend a lecture or participate in some other activity at the hospital, which he determined to be more educational, the attending nurse would monitor the pregnant woman. Petitioner also had the option of observing the delivery of a baby by the attending physician, in the event petitioner chose to participate in the monitoring process. On some occasions he would assist in the delivery or actually deliver the baby under the supervision of the attending physician. Following the delivery, petitioner had the choice of whether to observe the physical condition of the baby and the mother. Normally, petitioner chose not to do this because no complications arose and in his judgment to do so would not enhance his educational development. Petitioner made inquiries of the nurses to make this determination.

Petitioner was required to work in the emergency room from 7 p.m. to 7 a.m. every fourth day of the week. Usually he was the only physician present at the hospital during this time period. If an emergency situation arose, regarding either a patient in the hospital or a patient who had been brought to the hospital that particular night, petitioner was the first person to observe and treat the patient. Petitioner notified the attending physician to inform him of the patient's condition and to follow any additional instructions of the attending physician.[5]

---

[5]On a few occasions, the attending physicians would not allow petitioner to treat their patients.

During the period from January 1 to June 30, 1973, the hospital waived petitioner's requirements to perform services pursuant to the manual except as to his work in the emergency room each fourth night.

From January 1 to June 30, 1973, petitioner received a stipend of $6,150 ($875 per month plus $150 per month for housing allowance). Petitioner excluded from income $1,800 ($300 per month for 6 months) as a fellowship grant and $900 ($150 per month for 6 months) as housing allowance. The Commissioner, in his statutory notice of deficiency, determined that the entire amount excluded by petitioner was taxable income.

## OPINION

The Court is again called upon to decide whether the stipend paid to a hospital intern is excludable from his gross income under section 117(a)(1).[6] That section, in the form applicable during the year in controversy, excludes from gross income any amount received as a "scholarship at an educational institution (as defined in section 151(e)(4))" or as a "fellowship grant." In section 151 (e)(4), the term "educational institution" is described as one which "normally maintains a regular faculty and curriculum and normally has a regularly organized body of students in attendance." We do not understand that petitioner here contends that the hospital meets that description. The issue is thus narrowed to whether the stipend was a "fellowship grant."

Section 117(a)(1) does not define the term "fellowship grant." The regulations, however, provide that the term does not include any amount paid to an individual "to enable him to pursue studies" if such amount represents "either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor." Amounts paid to an individual to enable him to pursue studies are considered amounts received as a fellowship grant "if the primary purpose of the studies or

[6]SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS.

(a) GENERAL RULE.—In the case of an individual, gross income does not include—

    (1) any amount received—

        (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or

        (B) as a fellowship grant,

including the value of contributed services and accommodations; * * *

research is to further the education and training of the recipient in his individual capacity" and if the payments are not intended to compensate him for services. Sec. 1.117–4(c), Income Tax Regs.[7]

The validity of these regulations was sustained by the Supreme Court in *Bingler v. Johnson*, 394 U.S. 741, 751 (1969). In upholding the regulations, the Supreme Court did not engage in an abstract weighing and balancing of the purposes of the payments at issue but rather took a "common sense approach." *Parr v. United States*, 469 F.2d 1156, 1158 (5th Cir. 1972). That approach was explained in *Hembree v. United States*, 464 F.2d 1262, 1265 (4th Cir. 1972), which involved payments to a hospital intern, as follows:

In considering and sustaining the validity of Treasury Regulation 117–4(c) * * * , the Supreme Court bypassed discussion of the "primary purpose" dialogue and bluntly stated that "the definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no strings' educational grants, with no requirement of any substantial *quid pro quo* from the recipients." The clear import of this language is that if there is any substantial *quid pro quo*, i.e., compensation for services, the payments cannot qualify for exclusion from income as "fellowship" funds. In the wake of *Bingler*, the courts have uniformly held that payments such as those here under consideration are not excludable. See *Wertzberger v. United States*, 441 F.2d 1166 (8 Cir. 1971), aff'g. 315 F.Supp. 34 (W.D. Mo. 1970); *Quast v. United States*, 428 F.2d 750 (8 Cir. 1970), aff'g. 293 F.Supp. 56 (D.C. Minn. 1968); *Tobin v. United States*, 323 F.Supp. 239 (S.D. Tex. 1971); *Kwass v. United States*, 319 F.Supp. 186 (E.D. Mich. 1970).

Under this test, we think it quite clear that the hospital required a substantial quid pro quo from petitioner in return for the stipend which it paid to him. The hospital's payments to

---

[7]Sec. 1.117–4 Items not considered as scholarships or fellowship grants.

(c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.* (1) Except as provided in paragraph (a) of section 1.117–2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.

However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. * * *

petitioner enabled it to gain his services. They are, therefore, taxable to him.

The intern-hospital contract signed by petitioner and the hospital obligated petitioner to "perform all the duties assigned to him to the best of his ability, to maintain standards of professional competence as determined by the Hospital, and to conduct himself in a professional manner at all times." During the period of the contract, petitioner agreed to refrain from "engaging or participating in any outside activities of a professional nature" or "non-professional activities which would interfere with his effective performance" of the contract. The letter transmitting the intern-hospital contract to petitioner for signature stated, among other things, that interns "are considered employees of the Hospital" and that the hospital, therefore, would obtain liability insurance to cover petitioner. "A disinterested 'no-strings attached' motive by the * * * [hospital] cannot be inferred from these arrangements." *Weinberg v. Commissioner*, 64 T.C. 771, 777 (1975).

Not only did the hospital exact from petitioner a contractual promise to perform the duties assigned to him, petitioner admits in his reply brief that he performed substantial services, as follows:

During the first half of the year 1973, petitioner's primary endeavor at the Hospital was to further his medical knowledge and skill in an intern educational training program in accordance with standards established and approved by the American Osteopathic Association. In order to accomplish this end *my responsibilities at the hospital included monitoring patients status, perform and dictate patient history and physical examinations, assist whenever possible in surgery, care for outpatients in the emergency room where one might also perform minor surgical procedures, monitor labor, assist in delivery and be on duty in the Hospital during my assigned hours and longer should an educational experience present itself.* [Emphasis added.]

Much of petitioner's testimony on his services was related to his obstetrical work. He admitted that during his 1-year internship he was in attendance at more than 50 deliveries. The extent of his assistance depended upon the wishes of the individual patient's doctor. In some cases, petitioner monitored the patient until delivery was imminent and then called the patient's physician. In other cases, he performed all the required delivery services. He also made regular rounds to examine the mothers and their babies in the obstetrical ward. While petitioner's testimony on his other work is not detailed, he

admitted that he performed services in the surgery and medicine departments and in the emergency room.

In performing these services, petitioner's assigned duty hours during his 18-week daytime rotation of services were from 7 a.m. to 7 p.m. with 1 day off each week for 3 weeks and 2 days off on the fourth week. Twice during his internship year, petitioner spent 6 weeks on night duty with Saturday nights off. During 1973, the hospital had four interns with similar schedules, and when none of the interns were on night duty at the hospital, certain doctors in private practice were under contract to cover the emergency room.[8] Petitioner's services and those of the three other interns thus provided a direct substantial benefit to the hospital. Without their assistance, the hospital would have been required to arrange for a long list of needed services from other sources, including outside contractual coverage of the emergency room six nights of each week. See *Rosenthal v. Commissioner*, 63 T.C. 454, 460 (1975); *Dietz v. Commissioner*, 62 T.C. 578, 586 (1974).

The circumstances of this case fit not only the quid pro quo test introduced in *Bingler v. Johnson, supra*, but also the "primary purpose" language in the regulation. Since his work at the hospital was a learning experience for him, petitioner argues that the primary purpose of the internship was educational. No doubt petitioner learned much from performing his assigned duties, but most apprentices or other beginners learn their work in on-the-job training. Although these apprentices may consider their work educational, their learning does not render their wages noncompensatory. *Fisher v. Commissioner*, 56 T.C. 1201, 1215 (1971); *Proskey v. Commissioner*, 51 T.C. 918, 925 (1969). Neither petitioner's view of his internship as educational nor his purpose to further his medical knowledge and improve his skill by accepting and completing his internship is relevant. The purpose to which section 1.117-4(c), Income Tax Regs., refers is the purpose for which the payments are made. *Parr v. United*

---

[8]Petitioner's requested findings of fact on his hours of duty are as follows:

12. The petitioner was generally at the Hospital from 7:00 a.m. to 7:00 p.m. for eighteen wks. with one day off a week and then on the fourth week he would have two days off and this cycle would repeat throughout his daytime rotation of services. He would then spend six wks. on night duty with Saturday nights off. These day and night cycles were repeated twice during the internship year.

13. During the nighttime hours when none of the four interns were at the Hospital, a group of doctors were under contract to cover emergencies. * * *

*States*, 469 F.2d at 1158. The fact that the hospital contracted for and received petitioner's services which were needed for the operation of the hospital shows that the primary purpose of the hospital was to secure his services and that the payments were not fellowship grants.

Indeed, the payments had none of the normal characteristics of a fellowship grant. *Anderson v. Commissioner*, 54 T.C. 1547, 1550 (1970); *Reese v. Commissioner*, 45 T.C. 407, 413 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967). The evidence before the Court does not show that the amounts of the stipends were determined in the light of the financial needs of petitioner or in recognition of special merit displayed in his prior academic work. *Proskey v. Commissioner, supra* at 924; *Weinberg v. Commissioner, supra* at 777; *Dietz v. Commissioner, supra* at 586; compare *Steiman v. Commissioner*, 56 T.C. 1350, 1355 (1971).

On the contrary, the payments to petitioner were treated as the compensation of an employee. The hospital withheld FICA employee and Federal and State withholding taxes from the stipend paid to petitioner in the same manner as it withheld taxes from other compensatory payments. *Parr v. United States, supra* at 1158; *Woddail v. Commissioner*, 321 F.2d 721, 724 (10th Cir. 1963), affg. a Memorandum Opinion of this Court; *Moll v. Commissioner*, 57 T.C. 579, 586 (1972). In addition, the hospital provided petitioner with liability insurance, medical insurance, hospitalization insurance, meals, and uniforms. "These fringe benefits are characteristic of an employer-employee relationship." *Weinberg v. Commissioner*, 64 T.C. at 778; *Rosenthal v. Commissioner, supra* at 460; *Anderson v. Commissioner, supra* at 1552.

Petitioner argues that the hospital's manual prescribing his duties was not enforced. Indeed, his testimony, in large part, is devoted to depicting the hospital as an unusual institution which allowed its interns to pick and choose their assignments and, when they wished, drop them for something else more interesting. He testified, for example, that "the mere fact this gal is in labor" would be no reason to deter an intern from leaving her so that he could observe a more interesting or educational activity in the hospital. The foregoing findings of fact give effect to this testimony, including a finding that "from January 1 to June 30, 1973," the hospital "waived petitioner's requirements to perform

services pursuant to the manual except as to his work in the emergency room each fourth night."[9] Nevertheless, as discussed above, petitioner admits that he performed the services enumerated in the long list quoted above from his reply brief, and the list of the services which petitioner admits he actually performed is strikingly similar to the list of duties prescribed by the manual and set out in the foregoing findings of fact. By the time the manual was waived, he and his fellow interns had evidently developed enough self-discipline to enable them to conduct themselves "in a professional manner" and "to maintain standards of professional competence" prescribed by the manual even though technically it had been "waived." Cf. *Fisher v. Commissioner, supra* at 1215.

Throughout his testimony and his reply brief petitioner repeatedly makes the points that the hospital did not charge the patients for his services and that his services were more helpful to the staff physicians than to the hospital. These statements, if true, are irrelevant since, as we have indicated above, the hospital contracted for, received, and paid petitioner for his services. As a result, the payments are taxable to him. Moreover, the record does not show how the hospital computed its charges to its patients. Even though the cost of providing interns' services may not have been an itemized charge, the hospital no doubt included the cost of providing such services as a factor in arriving at its total charges for hospital care. To the extent the interns' services aided the staff physicians, such services made the hospital a more attractive place for the care of their patients and thus served the ends of the hospital.

The trial record in this case is not as complete as it might be, but we think it is sufficient to show that the facts here are not materially different from the facts in the dozens and dozens of similar cases that have been litigated in recent years. We are

---

[9]The foregoing findings of fact state that petitioner's requirement to perform services pursuant to the manual delivered to him when he entered on duty was waived. A letter admitted in evidence in lieu of testimony from the hospital's Director of Medical Education, however, attaches a 1976 manual which, according to the letter, "states the regulations under which Dr. Adams' internship was conducted." That manual lists as interns' duties: (1) The making of regular rounds; (2) the performance of osteopathic treatments; (3) the recording of treatments and other data on patient charts; (4) the examination of patients on admission; and (5) the care of out-patients' minor injuries. These duties are not significantly different from the ones he actually performed or from those listed in the original manual.

reminded of Judge Brown's statement in *Parr v. United States, supra* at 1159, as follows:

we sympathize with the District Court's lamentation that these facts, or facts nearly identical, have been litigated so often that one may wonder whether this is wise or what good it can do. * * * But hope springs eternal. And the heartbeat—the vital life sign to doctors young and old—of hope is the question begging structure of the regulations: Payments made for the "primary purpose—to further the education and training of the recipient" are fellowship grants *unless*—and the unless is a big unless—the amount provided for *such* purpose represents compensation. * * * Which is to say, this is not the last word, only the latest.

Had the Treasury Department followed Judge Brown's suggestion and replaced the "primary purpose" test of the regulation with the quid pro quo test set out in *Johnson v. Bingler*, 394 U.S. at 751, the "question begging structure of the regulations" would be eliminated. In that event, perhaps young doctors would find a more constructive endeavor than attempting to exploit this ambiguity in the regulation, and perhaps the latest word of some court on this subject would become both the latest and the last.

To reflect the disposition of other issues,

*Decision will be entered for the respondent.*

Reviewed by the Court.

GOFFE, *J.*, dissenting: I disagree with the holding of the majority. I would conclude from the record made before me in this case that $300 of the stipend received by petitioner each month qualifies for exclusion from income under section 117(a)(1).

We, and other courts, have uniformly held that the analysis of whether a stipend qualifies for exclusion is based upon all of the evidence presented; e.g., *Phillips v. Commissioner*, 57 T.C. 420, 427 (1971). As we stated in *Bailey v. Commissioner*, 60 T.C. 447, 452 (1973), "the purpose of the hospital in making the grant is, in large part, suggested by the nature of the activities carried on by petitioner." The freedom with which Dr. Adams operated suggests to me that the hospital did not expect significant benefits or services from him. *Vaccaro v. Commissioner*, 58 T.C. 721, 728 (1972).

I am unable to conclude from the record before us how the majority finds that the primary purpose for the payments was compensation for services rendered. Except for his work in the emergency room which accounted for approximately 25 percent of his hours at the hospital, petitioner was free to participate in the endeavors which *he* determined would be most educational.

I agree with the majority's conclusion that an analysis of each case must be based upon a "commonsense" approach, citing *Parr v. United States*, 469 F.2d 1156, 1158 (5th Cir. 1972). I differ, however, in the application of commonsense. I believe most employers are inclined to want to know what tasks an employee will be engaged in to insure that the needs of the business are covered. Instead of relying on the contract or "form" of the arrangement between petitioner and the hospital as the majority does, I would instead rely on how the parties in "substance" performed the terms of the contract. In the manner that Rocky Mountain Osteopathic Hospital operated, the hospital paid no attention at any given time as to whether petitioner was examining patients or attending lectures. His duties were not prescribed. The only activity of petitioner which was predictable by the hospital was his duty in the emergency room which I would find to be not substantial. It appears to me that the payments were more closely identified with enabling petitioner to educate himself than to render valuable services to the hospital. The test to be applied, according to the regulations, is the primary purpose for the payments. I recognize that substantial services resulted from petitioner's activities but the benefits conferred upon the hospital would be consistent with both a "no strings attached" grant and employment.

The majority, although finding as a fact that the hospital waived its rules and regulations governing petitioner's activities, nevertheless casts doubt on petitioner's testimony as to his freedom in choosing his activities. Petitioner testified unequivocally that the hospital never referred to the manual during his internship with respect to what the hospital expected of petitioner nor did the hospital establish a regimented program which the interns were to follow. When petitioner so testified, respondent did not claim surprise or ask to offer the testimony of a rebuttal witness. Respondent offered no evidence. Petitioner testified before me and only me and he impressed me as a candid, forthright witness and my observation of his demeanor

convinced me that he was truthful. Where evidence is competent, relevant, credible, and uncontradicted, the Tax Court may not arbitrarily discredit or disregard it. *Banks v. Commissioner*, 322 F.2d 530, 537 (8th Cir. 1963).

The majority finds as a fact that the manual was waived by the hospital during the period from January 1 to June 30, 1973, but somehow concludes that when it was waived the interns had developed enough self-discipline to conduct themselves in a professional manner. This conclusion is not in any way supported by the record before us. There is no evidence of any monitoring of the professionalism of the interns or other means to ascertain the quality of their performance.

The majority quotes from a letter by the director of medical education of the hospital stipulated into evidence in lieu of the director's testimony in which he states that the manual states the regulations under which Dr. Adams' internship was conducted. The majority, however, fails to comment upon the remaining portion of the letter which contains the following:

Rocky Mountain Hospital has an intern and a resident training program. A trainee stipend is paid each physician. The primary purpose of the program is to further the education and training of the recipient in his individual capacity, and the amount provided by the grantor for such purpose does not represent compensation for services to patients nor does it serve the interest of the grantor. In other words, services are of only incidental benefit to the hospital. The intern program is conducted under the rules and regulations of the American Osteopathic Association as published in their requirements for postgraduate medical training. * * *

The trainee stipend is defined as an amount paid or allowed to, or for the benefit of, an individual trainee to aid him in the pursuit of study and research in medicine.

Nor does the majority refer to a letter from the administrator of the hospital which the parties stipulated in lieu of his testimony. The administrator describes petitioner's internship as follows:

A valid and duly executed contract existed between the hospital and Dr. Adams which succinctly stated the nature of the appointment, the obligations and responsibilities of each party. Dr. Adams was in a training program in harmony with the educational regulations and requirements of the American Osteopathic Association. Dr. Adams was granted a stipend for the purpose of defraying his living expenses and other expenses related to the pursuit of this study program.

The Internship program at Rocky Mountain Hospital is not considered a source of employees for the hospital. They are here to further their medical education and experiences. They are considered as "employees" only in the

context of enabling the hospital to obtain professional liability (malpractice) insurance against claims.

The number of Interns may fluctuate from year to year, but this has no bearing on the number of employees needed for the hospital to function adequately. Any service provided by the Intern is merely incidental to his training and is not a source of income to the hospital. His program is established under rules and regulations of the American Osteopathic Association, clearly stating that emergency situations are the only exceptions considered more important than the advancement of his education.

There is no evidence in the record to refute the statements of the only hospital employees who described the intern program.

The record in this case is far from satisfactory but it contains the only evidence available from which to decide the case. Facts in other cases addressing the issue decided in this case, and facts not on the record in this case but which might have been on the record in this case had one or the other of the parties introduced the necessary evidence, are facts that, for purposes of deciding this case, must be considered nonexistent. This is so because, as the Court has stated on numerous occasions, findings with respect to questions of fact can properly be made only on the basis of the record before us; e.g., *Purvis v. Commissioner*, 65 T.C. 1165, 1169 (1976) ("Since it is a question of fact, our findings can properly be made only on the basis of the record before us"); *Silverman v. Commissioner*, 57 T.C. 727, 730 (1972), affd. without published opinion (8th Cir. 1973, 32 AFTR2d 73–5379, 73–2 USTC par. 9546) ("We must emphasize that in section 107 cases, as in all of our cases, the findings of fact and opinion are based on the evidence and proof presented in each case"). Accord, *Spartanburg Terminal Co. v. Commissioner*, 66 T.C. 916, 928 (1976) ("The decision we have reached here is based solely on the particular facts and circumstances of the record before us and is in no way intended to foreclose a different decision on the basis of a different record," quoting *Chesapeake & Ohio Ry. Co. v. Commissioner*, 64 T.C. 352, 383 (1975)). See *Schooler v. Commissioner*, 68 T.C. 867, 869 (1977) ("the issue is a factual one, to be decided on the basis of all the evidence"); *Colbert v. Commissioner*, 61 T.C. 449, 455 (1974) ("However, we must judge from the record before us"); *Estate of Roberts v. Commissioner*, 59 T.C. 128, 132 (1972) ("Our determination of values * * * have been made on the basis of the record as a whole"). Based strictly on the facts before us, and without regard to facts that could or should have been—but were not—presented, I would hold that

petitioner is entitled to exclude from income under section 117(a)(1) his stipend to the extent of $300 per month.

Although the issue is primarily a question of fact, the United States Court of Appeals for the Tenth Circuit, to which an appeal in the instant case will lie, reversed the Tax Court in favor of the conclusions accorded the evidentiary facts by the trier of those facts in *Edwards v. Commissioner*, 415 F.2d 578 (10th Cir. 1969), revg. 50 T.C. 220 (1968), by stating at page 581:

Although this determination is labeled as an "ultimate finding of fact," it obviously is a result reached by legal reasoning springing from evidentiary facts and the inferences to be drawn therefrom. As in Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed. 2d 1218 where the determinative issue involved gift or income, "primary weight in this area must be given to the conclusions of the trier of fact. * * * "

WILES and CHABOT, *JJ.*, agree with this dissenting opinion.