HENRY RICHARD HERRERA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Herrera v. Commissioner
Docket No. 3622-76.
United States Tax Court
T.C. Memo 1979-345; 1979 Tax Ct. Memo LEXIS 177; 38 T.C.M. (CCH) 1354; T.C.M. (RIA) 79345; August 30, 1979, Filed *177 Petitioner was a resident at Johns Hopkins Hospital and received a grant from the National Institute of Mental Health. The grant payments represented compensation for present employment services that were subject to direction of the grantor. Held, the payments are not excludable scholarship or fellowship grants. Section 117 (a), I.R.C. 1954 . Henry Richard Herrera, Pro se. William E. Bonano and Peter D. Bakutes, for respondent. IRWIN
MEMORANDUM *178 FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioner's income tax in the amounts of $743.04 and $962.30 for the taxable years 1973 and 1974, respectively. Concessions having been made, the only issue remaining for our decision is whether petitioner is entitled to exclude from gross income, pursuant to section 117[1], amounts paid him by Johns Hopkins University as a scholarship or fellowship grant. FINDINGS OF FACT Some of the facts have been stipulated. The findings of fact, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner, Henry Herrera, filed his income tax returns for the taxable years 1973 and 1974 with the Internal Revenue Service Center at Philadelphia, Pennsylvania. At the time he filed his petition herein, petitioner resided in Baltimore, Maryland. Petitioner received his M.D. degree in 1970 from Creighton University. During the next year, he was an intern at Baltimore City Hospital and from 1971 to July 1973, he was employed by the United States Public *179 Health Service in Washington, D.C. In July 1973, petitioner was admitted to a three-year psychiatric residency program at the Henry Phipps Psychiatric Clinic, a clinical department of Johns Hopkins Hospital (hereafter Hospital). The Hospital is a private teaching hospital allied with the Johns Hopkins University School of Medicine (hereafter University) and provides psychiatric training through its residency program, consisting of a structured, supervised sequence of increasing patient care responsibility. The University administers the educational programs of the Medical School, registers its students, and disburses stipends. Petitioner received $5,250 during the second half of 1973, $11,200 in 1974, and approximately $13,000 in 1975 from the University while a resident at the Hospital. This amount was not determined on the basis of financial need. Ninety percent of the amount paid by the University to the Hospital residents comes from fees earned by physicians employed by the Hospital, who are not interns or residents, which fees are remitted by the Hospital to the University. Of the amount paid to petitioner by the University, however, the source of $3,600 in 1973 and *180 $3,800 in 1974 was a National Institute of Mental Health (hereafter NIMH) block grant awarded the University in July 1970 and renewed annually through June 30, 1975. These grants were awarded to the University in order to increase the number of psychiatrists and improve the quality of psychiatric training programs. The University did not withhold Federal income taxes or FICA tax from amounts paid to petitioner. Petitioner was not aware of the NIMH grant until he began his residency, however, and expected the amount of funds he was to receive from the University to have remained the same regardless of the source of the funds. The University also contributed part of petitioner's health insurance premiums, and the Hospital provided him with malpractice insurance. Petitioner was also entitled to free prescriptions and medical care through the University health service, although he was not entitled to use the health service which the Hospital maintained separately to treat its employees. The Hospital is a separate corporation governed by it own Board of Trustees and has an endowment independent from the University and its School of Medicine. The two institutions are closely related, *181 however, and the activities of the Hospital and the School of Medicine are coordinated by the Johns Hopkins Medical Institution's Council, composed of the president of the University (who is also president of the Hospital), he deans of the schools of medicine, hygiene, and public health, and the executive vice president and director of the Hospital. All members of the Hospital house staff are registered as post doctoral students at the School of Medicine and are appointed as fellows of the University. In addition, the head of each clinical department of the Hospital is also the professor and director of the corresponding academic department in the School of Medicine; the School of Medicine and the Hospital share the salary expenses of these dual department heads. During his residency at the Hospital, petitioner was responsible for a minimum caseload of at least two patients during his first year and five patients during his second year, although a higher caseload was expected to be carried. The average yearly caseload carried by the residents was 13, 17, and 15 for first, second, and third-year residents, respectively, and the average number of patients treated by the residents *182 was 77, 66, and 65 for first, second, and third-year residents, respectively. Petitioner worked an average of 72 hours a week at the Hospital and spent an additional five hours a week at seminars and conferences. He was also on 24-hour call at least twice a month. Petitioner performed the following services while a resident: screening and admitting patients; writing admission orders; planning treatments of patients; diagnosis of patients, prescribing medication, supervising administration of drugs; follow-up patient care for released in-patients; staffing 24-hour emergency service; discharging patients; ward administration, supervision and instruction of medical students; supervision and instruction of first-year residents; participation in group and family therapy sessions; and consultation with hospital physicians. Petitioner excluded from his income as a scholarship $1,800 in 1973 and $3,800 in 1974 of the amounts he received from the University. [2] Respondent determined that the full amount petitioner received was taxable income. *183 OPINION A scholarship or fellowship grant is excludable from income under section 117(a). Although "scholarship" and "fellowship grant" are not defined in the statute, section 1.117-3(c) of the Income Tax Regulations provides: "A fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." In addition, section 1.117-4(c)(1) of such regulations states that if any "amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor," it does not qualify for exclusion under section 117. Petitioner first contends that the regulations are invalid because they do not take into account the distinction between providing services as part of one's training and providing services as an employee. The Supreme Court, however, upheld the validity of these regulations and stated that the definitions contained therein comport with "the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial *184 quidproquo from the recipients." Bingler v. Johnson,394 U.S. 741 (1969). The test to be applied under the regulations is whether the primary purpose for making the payments to the taxpayer was to educate and train him or to compensate him for services rendered. Weinberg v. Commissioner,64 T.C. 771 (1975); Carroll v. Commissioner,60 T.C. 96 (1973); Proskey v. Commissioner,51 T.C. 918 (1969); Reese v. Commissioner,45 T.C. 407 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967). Thus, even if the primary purpose of the University or Hospital is to train residents, the stipends do not qualify under section 117 if the primary purpose for payment was to compensate the recipients for medical services. Rosenthal v. Commissioner,63 T.C. 454, 460 (1975). We believe, therefore, that petitioner, by looking only to the educational aspects of the training, ignores the services he provided the Hospital and focuses upon the purpose of the program rather than upon the purpose of the payments.As we noted in Bailey v. Commissioner,60 T.C. 447, 452 (1973), *185 "[the] purpose of the hospital in making the grant is, in large part, suggested by the nature of the activities carried on by the petitioner." We believe that petitioner rendered extensive and valuable services to the Hospital no different in any important respect from those rendered by interns and residents in cases previously considered by this Court, the effect of which was clearly to provide a quid pro quo. Thus, the primary purpose of the payments made by the University was to compensate petitioner for these services. Bingler v. Johnson,supra. The fact that petitioner had no primary responsibility for the care of patients is not inconsistent with his receiving compensation, Brubakken v. Commissioner,67 T.C. 249, 251 (1976). Other factors also support the conclusion. The amount of the grant was not determined on the basis of financial need, and the increases petitioner received during his second and third year were apparently due to his increased experience. Adams v. Commissioner,71 T.C. 477 (1978); Brubakken v. Commissioner,supra, at 259; Dietz v. Commissioner,62 T.C. 578, 586 (1974); *186 Proskey v. Commissioner,supra, at 924. Petitioner also received free health care and malpractice and health insurance. Brubakken v. Commissioner,supra;Weinberg v. Commissioner,supra, at 778; Proskey v. Commissioner,supra, at 924. [3]
Petitioner contends, however, that the University was the grantor of the funds and the Hospital only provided the facilities for training him; [4] therefore, because the faculty of the Medical School supervised petitioner and received no benefit from his services, the payments did not represent a quidproquo. We must reject petitioner's argument, as we believe that the University and Hospital are indistinguishable for *187 purposes of determining the grantor. In Rosenthal v. Commissioner,supra, the Marquette Graduate School in affiliation with Marquette Medical School and six hospitals in Milwaukee, Wisconsin, operated a master of science and surgical residency program. The taxpayers received funds from both the County of Milwaukee and the Veterans Hospital. During their surgical residence, the taxpayers were assigned to affiliated hospitals under a standard rotation schedule. Both the rotation schedule and the residency program as a whole were controlled by Marquette.Nonetheless, we held that "the payments in question constituted compensation for present services that were subject to the direction or supervision of the grantors." [5] Thus, even if the ultimate control of the residency program here is in fact vested with the University, this does not provide sufficient grounds for finding that the payments were not for services. We note that the University and Hospital have common academic and clinical department heads, a common president, and a common administrative council. In addition, the University and Hospital share salary expenses and the University is reimbursed by the *188 Hospital for 90 percent of the amount the residents receive from the University. *189 Finally, we note that petitioner acknowledges that case law is against him and earnestly urges this Court to reconsider its position and recognize the necessity for a doctor to undergo a residency program to obtain training in his chosen specialty. We do not doubt that the payments were beneficial in enabling petitioner to further his education by helping to defray expenses and providing him with highly valuable training. This is, of course, not inconsistent with our finding that the stipends represented compensation, Brubakken v. Commissioner,supra, at 257-258. We believe that any change in the law at this late time must come from Congress. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2. Petitioner concedes that the amount of grant excludable from income under section 117(a) is subject to the dollar limitations of section 117(b)(2)↩. Therefore, only $3,600 is excludable in 1974 ( $300 X 12 months) and $1,800 in 1973 ( $300 X 6 months).
3. No be sure, petitioner's health insurance premiums were paid for by the University and he was entitled to use only the University's health service, not the Hospital's. We do not believe that this distinction is important due to the interrelationship of the Hospital and the University. We note also that the University did not withhold income or social security tax from the grant, although this, of course, is not determinative.↩
4. Petitioner does not contend that NIMH is the grantor, and it is clear the institution receiving the funds is the grantor, Fisher v. Commissioner,56 T.C. 1201, 1214↩ (1971). 5. In Hof v. Commissioner,T.C. Memo. 1979-55; the taxpayer was a resident in a program affiliated with the University of Minnesota graduate and medical school, which maintained ultimate control of the program which incorporated the clinical experience into a systematic course of instruction. The University assigned faculty members to supervise the residents and rotated the students to various hospitals. We held that the control exercised by the University was insufficient to justify a finding for the taxpayer. See also Ulvestad v. Commissioner,T.C. Memo. 1979-60; and Haygood v. Commissioner,T.C. Memo. 1977-71↩, where the taxpayer was a resident in the Tulane University department of surgery residency program while enrolled in the University's department of graduate and postgraduate medical studies. The taxpayer paid an annual registration fee to the University and the intern and residency program was coordinated with several hospitals but under the direction of the University; additionally, the taxpayer could be rotated to various hospitals.