JOSEPH MICHAEL SABER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; THOMAS L. ARNSTON and DARLENE S. ARNSTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Saber v. Commissioner
Docket Nos. 2752-79, 11408-80, 11416-80.[1]
United States Tax Court
T.C. Memo 1981-477; 1981 Tax Ct. Memo LEXIS 273; 42 T.C.M. (CCH) 945; T.C.M. (RIA) 81477; August 31, 1981. Eugene C. White and John C. Shaffer, for the petitioners. James M. Eastman, for the respondent. TANNENWALD
MEMORANDUM OF FINDINGS OF FACT AND OPINION TANNENWALD, Chief Judge: In these consolidated cases, respondent has determined deficiencies in petitioners' income tax as follows: Petitioner
Docket No.
Year
Deficiency
Joseph Michael Saber
2752-79
1975
$ 802
Joseph Michael Saber
11408-80
1976
851
Thomas L. and Darlene S.
Arnston
11416-80
1976
1,008
The sole issue presented is whether petitioners are entitled to exclude payments from their gross income as scholarship or fellowship grants under section 117. [2]
*274 FINDINGS OF FACT Some of the facts have been stipoulated and are found accordingly. Petitioner Joseph Michael Saber (Saber) resided in Loma Linda, California, when he filed his petitions herein. Petitioners Thomas L. Arnston (Arnston) and Darlene S. Arnston resided in Big Bear Lake, California, when they filed their petition herein. They jointly filed their Federal income tax return for 1976. Henceforth, all references to petitioners shall refer to Saber and Arnston. Saber graduated from the Loma Linda University School of Medicine in September 1974. He was then accepted into the resident training program in radiology at the Loma Linda University Medical Center (the Hospital) for a program running from November 1, 1974, through October 31, 1978. He was licensed to practice medicine in March 1976. In early 1969, Arnston completed his internship and was licensed to practice medicine. He was in the military service from late 1968 through 1973. He entered the resident training program in internal medicine at the Hospital in 1974, but switched to the radiology program in 1975. He completed the resident training program in radiology in 1978. [3]
*275 The resident training program at the Hospital was a three to four-year program in which residents were accepted and expected to complete the full term, although they signed a series of one-year contracts. These contracts were standardized forms provided by the Hospital and were used for all residents, regardless of specialty. All residents were required to sign this contract prior to commencing training at the Hospital. Pursuant to the contract, the Hospital agreed to provide a monthly stipend [4] to the resident, payable bi-weekly, meals while on duty, uniforms and uniform laundry service, ten paid vacation days and eight holidays, malpractice insurance for activities within the training program, family hospitalization insurance, ten days' sick leave, disability insurance, narcotics license fee, tuition-free courses at the university, and medications at cost. The Hospital also agreed to provide a suitable environment for graduate medical educational experience, training which met the appropriate specialty board, and to allow the resident to engage in any professional activity approved of by the program director and a committee. Each resident, in turn, agreed to perform to the *276 best of his ability the usual and customary services of one on the appointed service, to conform to Hospital rules, regulations, policies, and procedures, and not to engage in outside employment or professional activities without permission. [5] Federal and State income taxes and FICA taxes were withheld from the stipends paid to petitioners. A resident in the diagnostic radiology training program would spend the first two hours of the day looking at current X-rays and scans (usually taken of patients the night before) and prepare a proposed *277 report. A staff radiologist would later examine the report, and X-rays, and discuss them with the resident. The report would then be corrected or redrafted by the staff radiologist for the benefit of the treating physician. After examining the morning films, the residents would spend two hours studying, until their noon conference, which was usually taught by the staff radiologist for an hour-and-a-half. They would then continue reading films and scans and attend a physics class in the afternoon, ending the day with another conference. Petitioners rotated among various sub-specialties, such as chest and bone X-rays, GI examinations, and nuclear medicine, while in the program. They also were required to spend one night a week and one weekend in six in the emergency room as part of their emergency rotation in the program. [6] The resident would be on call in the Hospital while the staff radiologist on call was at home, available for consultation by phone or if needed. Although any diagnosis made by the resident would be reviewed the next day by the staff radiologist, the on-call time in the emergency room provided the resident with experience at being the "last word." *278 Petitioners, like the staff radiologists, had little direct patient contact. They observed the taking of X-rays of patients by technicians during GI examinations, and learned, by participating, the techniques of giving such examinations. They made entries on patient charts under the supervision of staff physicians. During the years in question, petitioners were subject to close supervision and review. It took longer for the staff radiologists to read the films and review and discuss the proposed reports than it would have had they reviewed the films on their own from the start. The Hospital had more radiologists on its staff than would have been needed were it not a teaching hospital. As their residency progressed, however, petitioners became more proficient at diagnosing problems on the films and in articulating such diagnoses in the reports. The Hospital referred to the amounts paid its residents as "stipends." The amounts of these payments were based on the year of residence of the recipient, and were not dependent upon need, special academic qualifications, department of specialty, or performance. They were set by the Hospital to be competitive with the amounts paid *279 to residents at other hospitals. Petitioners were not required to keep time sheets, nor were their time and efforts directly billed to patients. They had no teaching responsibilities. They were required to do two research projects during the program. ULTIMATE FINDING OF FACT The amounts paid to Saber for 10 months in 1975 and to Saber and Arnston in 1976 represented compensation for services to the Hospital. OPINION This is another in a seemingly endless line of cases dealing with whether payments to medical residents and interns -- in this case to radiology residents -- may be excluded from gross income under section 117. We see no need to repeat the litany of the cases in this area or to explore the various deviations from the so-called norm which the opinions have explored. It is enough to observe that the ultimate issue to be resolved is whether the petitioners herein were paid to study or to work ( Meek v. United States, 608 F.2d 368 (9th Cir. 1979); Weinberg v. Commissioner, 64 T.C. 771, 776 (1975); section 1.117-4(c), Income Tax Regs.) or, to put it another way, whether the payments were for a quid *280 pro-quo, as distinguished from "relatively disinterested, 'no-strings' educational grants" ( Bingler v. Johnson, 394 U.S. 741, 751 (1969)). The issue is one of fact and involves a determination as to whether there are sufficient elements present herein to distinguish the position of petitioners from that of taxpayers in the numerous cases which have decided that payments to medical residents and interns do not qualify for the section 117 exclusion. See Adams v. Commissioner, 71 T.C. 477, 488 (1978). The burden of proof is on the petitioners. Rule 142(a). Although not determinative in and of themselves, it is significant that the contracts pursuant to which the petitioners received their stipends bespeak an employment relationship, as do the manner in which the payments were treated for income tax purposes by the Hospital. The amounts of the stipends were substantial (see note 4, supra) and were not based on financial need or educational achievement in academic work. Although there is some indication that the annual increases were related to a cost of living adjustment, we are not convinced that increased experience of benefit to the Hospital *281 was not involved. The fact that radiologists have substantially less contact with patients than do residents in other fields of medicine is not determinative. [7] Neither is the fact that their reports of X-ray exams had to be substantially edited or revised convince us that those reports were not of benefit to the staff radiologists and, through them, to the Hospital. The benefit was there and cannot be ignored any more than petitioners' services in the mergency room, albeit that those services were relatively not substantial. Similarly, the fact that there was close supervision of petitioners' work does not preclude the conclusion that they provided a benefit to the Hospital. Nor are we impressed by the suggestion that the radiology residents may have caused the Hospital more trouble than they were worth because, without their presence, the Hospital could have gotten along with a smaller staff. That may conceivably have been the case but, if so, it seems to us that this would be likely to be true of every teaching hospital. Carried to its logical conclusion, this line of reasoning, if determinative, would require a decision that all payments of residents and interns in teaching *282 hospitals would qualify for the section 117 exclusion. Finally, petitioners' contention that rulings by the National Labor Relations Board that medical residents are students should control our decision herein is without merit. [8]
The long and the short of the matter is that we are not convinced that petitioners have carried their burden of proof. Accordingly, we hold that they should be treated no differently then their counterparts in the Hospital or in the same field in other hospitals. [9]
*283 Decisions will be entered for respondent. Footnotes
1. These proceedings were consolidated for trial, briefing, and opinion.↩
2. All section references, unless otherwise indicated, are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All Rules references refer to Tax Court Rules of Practice and Procedure.↩
3. The testimony at trial differs from the stipulation as to the precise dates during which petitioner Arnston was in the radiology program. After reviewing the record, we are inclined to accept Arnston's testimony over the stipulation. This fact does not affect the outcome of our decision.↩
4. For Saber, the monthly stipend was $ 866.02 during the period November 1, 1974, to October 31, 1975, and $ 946.74 during the period November 1, 1975, to October 31, 1976. For Arnston, the monthly stipend was $ 1,117.66 during the period January 1, 1976, to December 31, 1976. ↩
5. Arnston earned substantial amounts of money during 1976 by working nights as a physician (other than a radiologist) in the emergency room of the Hospital. Saber also worked a few nights in another hospital and was paid separately therefor. Petitioners do not argue that the separate payments received for these services should be excluded under section 117↩.
6. These emergency room duties were in addition to one two-month daytime emergency room rotation during the entire program, under the supervision of a staff radiologist.↩
7. See Homer v. Commissioner, T.C. Memo. 1977-66↩.
8. See Tsou v. Commissioner, T.C. Memo. 1980-100; Woodling v. Commissioner, T.C. Memo. 1976-391↩.
9. See Perry v. Commissioner, T.C. Memo. 1981-134 and White v. Commissioner, T.C. Memo. 1978-109, involving residents in other specialties signing essentially the same contract with the Hospital, and Burstein v. United States,     Ct. Cl.    , 622 F.2d 529 (1980); Bretz v. Commissioner, T.C. Memo. 1978-54; Homer v. Commissioner, supra; Ferrill v. Commissioner, T.C. Memo. 1975-179, which denied the section 117↩ exclusion to residents in radiology.