RANDALL H. BRYANT and JO ANN J. KRUKAR-BRYANT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bryant v. Commissioner
Docket No. 16709-79.
United States Tax Court
T.C. Memo 1982-647; 1982 Tax Ct. Memo LEXIS 105; 45 T.C.M. (CCH) 60; T.C.M. (RIA) 82647; November 8, 1982. Randall H. Bryant and Jo Ann J. Krukar-Bryant, pro se. Cynthia Joanne Mattson, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to and heard by Special Trial Judge Francis J. Cantrel pursuant to the provisions of section 7456(c), [1] Internal Revenue Code of 1954, as amended, and General Order No. 6 of this Court, 69 T.C. XV. [2] After a review of the record, we agree with and *106 adopt his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE CANTREL, Special Trial Judge: Respondent determined a deficiency in petitioners' Federal income tax for the taxable calendar year 1977 in the amount of $752.00. A concession having been made by petitioners, [3] the sole issue for decision is whether petitioners are entitled to exclude from gross income the amount of $3,566 as a scholarship or fellowship grant under section 117. FINDINGS OF FACT Some of the facts have been stipulated by the parties. The stipulations of facts and attached exhibits are incorporated herein by this reference. Jo Ann J. Krukar-Bryant, referred to hereinafter as petitioner, resided at 4108 33rd Street South, No. 1-B, Arlington, Virginia and Randall H. Bryant resided at 402 East 74th Street, *107 Apt. 5-G, New York, New York, on the date the petition was filed. They timely filed a joint 1977 Federal income tax return with the Internal Revenue Service. Petitioner was a candidate for a Master of Arts degree in Health Care Administration at George Washington University, Washington, D.C. from January 1976 through May 1978, her date of graduation. Her field of concentration was health planning, which is designed to prepare students to plan for and coordinate all aspects of private and public health care systems in accordance with sound management principles. It is an interdisciplinary program which includes courses from (1) health care administration; (2) health care planning; (3) supporting disciplines such as sociology, urban and regional planning; quantitative methods, and public administration; and (4) a particular area of concentration selected by the student to gain a specific skill. In addition to the course work there are periods of supervised field experience for which written reports are required. As a prerequisite for the Master of Arts degree, all candidates in the health planning field were required to fulfill a period of supervised field experience, as approved *108 by each candidate's faculty advisor. Health Care Administration 288 (Seminar-Field Problems Studies) [hereinafter referred to as HCA 288] was the course designated by the University to the supervised field experience. Petitioner, like all other candidates for the same degree, was required to take HCA 288 to complete the requirements for her masters degree. Her faculty advisor was Philip N. Reeves, a Doctor of Business Administration (Dr. Reeves), Chairman of the Department of Health Care Administration. In the spring of 1977, Dr. Reeves announced the availability of a position as a student intern with the Appalachian Regional Commission (Commission) to his students, including petitioner, as a supervised field experience, which would, upon further discussion with the Commission, be likely to be approved as satisfying the requirements of HCA 288. Dr. Reeves was informed of this position by Mr. E. Fenn Dickenson (Dickenson), an analyst in the Health Division of the Commission, who had been informed by the Commission's personnel office that an employment slot for a summer intern was available for the Health Division. The Commission was desirous of hiring a person with graduate *109 health education skills to assist its Health Division in its responsibilities in preparing an update of the Ohio State health plan and in performing research for a paper on biases against rural areas in health care. The Commission employed summer interns in other years before and after 1977, the number dependent on need and budget restrictions. Dickenson knew Dr. Reeves because the former had been in the same master's program at George Washington University earlier. He contacted Dr. Reeves to determine if the latter could recommend a student from the master's program to fill the summer intern position for the Health Division. The position, as announced by Dr. Reeves related directly to petitioner's field of concentration, health planning. As she had not fulfilled her supervised field experience requirement, she applied for the position. Petitioner, along with several other students, submitted resumes to Dr. Reeves, who submitted the resumes to the Commission. In May 1977, the applicants were interviewed by several analysts in the Health Division, including Dickenson.Petitioner was selected by the Commission to fill the summer intern slot. She was the only summer intern assigned *110 to the Health Division in 1977. Dr. Reeves determined that petitioner's work for the Commission would satisfy the requirements of HCA 288. Petitioner received three credits for her supervised field experience toward the credits necessary for graduation. She paid tuition to the University for these credits. Dickenson acted as petitioner's "preceptor", or field supervisor for the field experience. Petitioner periodically provided Dr. Reeves with progress reports on her work at the Commission. These reports formed the basis of discussions between Dr. Reeves and petitioner regarding her field experience. At the end of petitioner's term with the Commission, Dickenson completed a form provided by Dr. Reeves evaluating petitioner's performance. Petitioner worked for the Commission as a summer employee from June 5, 1977 until September 23, 1977. The Commission is a combined Federal and State government agency, with a pay scale and grade designation equivalent to that of the Federal government. Petitioner's employment title was "Clerk", grade 7, step 1, the position given to all summer interns. Her rate of pay was $11,523 per year and it was not dependent on her financial need *111 from the point of view of the Commission, since she was paid like any other grade 7, step 1 Federal employee. Effective October 9, 1977, the rate of pay for the position that petitioner had held was increased from $11,523 per year to $12,336, reflecting the annual U.S. cost of living increase. During 1977 petitioner received wages from the Commission totaling $3,565.96. Of this amount, $208.64 was withheld as FICA employee tax. No Federal or State income tax was withheld from her wages nor were any amounts withheld for health plans or charity. [4] She was paid on the normal government pay dates, every two weeks. Petitioner accrued annual and sick leave at the normal rate of 4 hours per pay period, and used some of this accrued leave while employed by the Commission. Her employment with the Commission did not count as time in service with the Federal government, nor did her accrued leave carry over to her employment with the Veteran's Administration after graduation. *112 Petitioner worked 8 hours per day, from 8:00 a.m. to 4:30 p.m., 5 days a week and devoted her 8-hour day exclusively to work for the Commission. Petitioner's immediate supervisor at the Commission was Dickenson, a grade 11 employee of the Commission in 1977, who was one of seven analysts in the Health Division, each of whom were assigned to a particular geographic area in Appalachia. Dickenson's region included the State of Ohio. Petitioner's work for the Commission consisted of assisting Dickenson in the regular duties for which he had responsibility. Her major assignment was to help Commission field personnel in Columbus, Ohio prepare an update of the Ohio State Health Plan to be submitted to the Commission's Washington, D.C. office for the purpose of determining the programs to be funded in Ohio. In fulfillment of her work on the Ohio plan, she traveled to Ohio two or three times for fact finding and consultation with Commission personnel in Ohio, consulted often over the telephone with the Ohio personnel, and provided technical assistance for the plan. As a result of her work on the Ohio plan petitioner independently discovered through general data compilation that *113 the pregnancy rate among teenagers in the Appalachian region of Ohio was unusually high. She made recommendations to the Commission regarding this problem area. In addition to the assignment on the Ohio plan, petitioner was assigned one other major task--research for a paper on biases against rural areas in health care, for which Dickenson had responsibility. Her research was provided in outline form to Dickenson. Petitioner performed other assignments on a daily basis for Dickenson. Petitioner's work for the Commission on the Ohio plan formed the basis of her graduate thesis: "State Health Plan for the Appalachian Region of Ohio". Prior to her enrollment in the masters program at the University petitioner was employed by the United States Army as a nurse. During her enrollment in that program she was the recipient of veterans benefits to aid her in her education. In addition, she was employed as a part-time nurse during another part of 1977 by Medox Corporation, a company providing temporary nursing services and she was a full-time student during the spring and fall semesters of 1977.
Petitioner's description of her work with the Commission for purposes of her resume *114 subsequent to graduation states that her responsibilities included data gathering, analysis, and report writing on such topics as rural health, employment and the recruitment of health professionals. The Commission considered petitioner to be a temporary employee. She was hired and paid to work on the Ohio State Health Plan and the paper on biases against rural areas in health care as well as other tasks assigned to her. On their 1977 return petitioners claimed a miscellaneous deduction for a fellowship grant in the amount of $3,565.96, which respondent has disallowed in full. OPINION Section 117(a)(1)(B) excludes from gross income amounts received as a fellowship grant. Section 1.117-3(c), Income Tax Regs., defines a fellowship grant as an amount paid to an individual to aid in the pursuit of study or research. Section 1.117-4(c), Income Tax Regs., provides that amounts paid as compensation for services or primarily for the benefit of the grantor are not excludable as fellowship grants. Once again we are required to make *115 a threshold determination as to whether the payments received by petitioner constitute a fellowship within the intendment of section 117(a). Reese v. Commissioner,45 T.C. 407 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967).The critical test is whether the primary purpose of the payments is to further the education and training of the recipient or to compensate her for services rendered. Weinberg v. Commissioner,64 T.C. 771, 776 (1975). More succinctly, the question is whether the taxpayer was "paid to work or paid to study". Dietz v. Commissioner,62 T.C. 578, 584 (1974). Each case must turn upon its own particular facts and circumstances. Zolnay v. commissioner,49 T.C. 389, 395 (1968). We have carefully detailed in our Findings of Fact all of the facts necessary for our disposition of this case. We see no reason to unnecessarily reiterate them. Suffice it to say that those facts disclose beyond a doubt that petitioner was hired by the Commission for the specific purpose of performing certain services and research for the Commission, and that she performed such services and research *116 for which she was paid a salary in the same manner as other full time employees. [5] "The circumstances of this case fit not only the quid pro quo test introduced in Bingler v. Johnson,supra, but also the 'primary purpose' language in the regulation." Adams v. Commissioner,71 T.C. 477, 486 (1978). On this record, we hold that the payments received by petitioner from the Commission in 1977 constituted compensation for present employment services or services subject to the supervision of the Commission and constituted payments made for research primarily for the benefit of the Commission and, hence, such payments are includable in petitioner's 1977 income. Since her work at the Commission was a learning experience for her, petitioners argue that the primary purpose for the payments was educational. We recognize, of course, that petitioner received valuable training in her work for the Commission. But, as this Court *117 said in Proskey v. Commissioner,51 T.C. 918, 925 (1969), "virtually all work as an apprentice, whether in medicine or law, carpentry or masonry, provides valuable training. Nothing in section 117 requires that an amount paid as compensation for services rendered be treated as a non-taxable fellowship grant, merely because the recipient is learning a trade, business or profession." Petitioners next urge that since the supervised field experience was required of all candidates seeking petitioner's particular degree, the payments received by petitioner are automatically excludable from income. "* * * [T]he fact that services are required of all degree candidates is not, in and of itself, determinative; in order for payments to be excludable from income under the exception to the limitation prescribed by section 117(b)(1), such payments must initially be found to have the characteristics of a scholarship or fellowship grant." Brubakken v. Commissioner,67 T.C. 249, 254 (1976). *118 The payments here had none of the normal characteristics of a fellowship grant. Adams v. Commissioner,supra at 487. Anderson v. Commissioner,54 T.C. 1547, 1550 (1970); Reese v. Commissioner,supra at 413. The evidence shows that the payments were not dependent on her financial need from the point of view of the Commission, since petitioner was paid like any other grade 7, step 1 Federal employee, she was a recipient of veterans benefits to aid her in her education and she was employed as a part-time nurse in 1977. Nor were they made in recognition of special merit displayed in her prior academic work. Proskey v. Commissioner,supra at 924; Weinberg v. Commissioner,supra at 777-778; Dietz v. Commissioner,supra at 586. On the contrary, the payments to petitioner were treated as the compensation of an employee. The Commission withheld FICA employee tax from the payments made to petitioner. [6] In addition, petitioner, had she remained, would have received an annual cost of living increase provided every Federal employee. She accrued annual and sick *119 leave at the normal rate accorded a Federal employee, and used some of the accrued leave while at the Commission. These fringe benefits are usually characteristic of an employer-employee relationship. Weinberg v. Commissioner,supra at 778; Anderson v. Commissioner,supra at 1552. Petitioners emphasize, in support of their position, that petitioner's duties were subject to supervision; that she was an extra employee in that she was not hired to replace anyone and no one was hired to replace her. We assume these contentions are raised to show that her unemployment was unnecessary and, thus, the payments she received were for the purpose of furthering her education. Supervision is not necessarily inconsistent with the presence of compensation. Weinberg v. Commissioner,supra at 779. Supervision of petitioner's work does not establish that her services were of no value to the *120 Commission and may have actually increased their value. Fisher v. Commissioner,56 T.C. 1201, 1212 (1971); Zolnay v. Commissioner,supra at 397. Nor is it significant that the Commission might have functioned without her services.The fact is that it did not do without those services. They utilized them and they paid for them. "Many employees may be dispensable in the sense that their employers could 'operate' without them. But such dispensability hardly renders their salaries noncompensatory." Fisher v. Commissioner,supra at 1215. [7]
On this record we hold that petitioner was paid to work not to study. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended. ↩
2. Pursuant to General Order No. 6, dated March 8, 1978, the post-trial procedures set forth in Rule 182, Tax Court Rules of Practice and Procedure↩, are not applicable to this case.
3. Petitioners conceded a moving expense deduction of $450, which they claimed on their 1977 return.↩
4. No Federal income tax was withheld because petitioner, on June 7, 1977, filed a Form W-4E, Exemption from Withholding (of Federal Income Tax), with her employer stating under the penalties of perjury that she incurred no liability for Federal income tax for 1976 and anticipated that she would incur no liability for Federal income tax for 1977.↩
5. In the words of Mr. Kennelly, the Acting Director of the Commission's Health Division--"I viewed her employment that summer as a temporary employee, a summer intern who would be assigned specific duties that would be helpful to us."↩
6. It would have withheld Federal income tax had petitioner not filed the Form W-4E disclosing she would not incur liability therefor in 1977.↩
7. We have carefully reviewed each case cited to us by petitioners in support of their position and find them to be distinguishable.↩